**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LINDSAY R. COOPER; JAMES R. SUTTON; KIM GIESEKING; CHARLES A. YARRIS; ROBERT M. MILLER; CHRISTOPHER G. BITTNER; ERIC MEMBRILA; JUDY GOODWIN; JENNIFER L. MICKE; JOHN W. SEELBACH; MAURICE D. ENIS; JAIME L. PLYM; NATHAN J. PIEKUTOWSKI; CAROLYN A. WHITE; LOUIE VIERNES; MICHAEL L. SEBOURN; K.S., an infant by his father and natural guardian Michael L. Sebourn; CHRISTIAN M. EBUENG; PAUL J. ENCINIAS; DANIEL E. HAIR; ADAM W. KRUTZLER; DAVID K. MALONE; ROBERT SELIGMAN; ELOI A. WHITEMAN; JASON D. HENRY; NELLIE ALLEN-LOGAN; JAMI BESCHORNER; NATHAN CANCHE; NATHAN CRISWELL; JASON TROY FRIEL; OSCAR GONZALEZ; DAVID HAHN; JAMES JACKSON; JARRETT BRADY JOHNSTON; JONATHAN MEDINA; ADAM MINTZ; MALLORY K. MORROW; WILLIAM NETHERTON; MICHELLE ODEN; DONALD RAIRIGH; CHRISTOPHER RICKARD; ANDREW RIVERA; STEVEN RAY SIMMONS; AKEEM SMITH; JUSTIN SPENCER; | No. 15-56424<br><br>D.C. No. 3:12-cv-03032-JLS-JLB<br><br><br>OPINION |

ALAN SPURLING; ANGEL TORRES; JOHN & JANE DOES 1–70,000; ANTHONY GARCIA; JASMINE ALLEN; RHONDA ANBERT; SUSAN ASH; ADAM ARMENTA; JINKY M.A., individually and as the Administrator of the Estate of Charliemagne T.A.; J.C.A., a minor by his mother as guardian ad litem Jinky M.A.; J.A., a minor by his mother as guardian ad litem Jinky M.A.; DANA AUSTIN; RENAR AWA; JOSH BANE; ARAMIS BARRIOS; TREVOR BECK; MARKUS BEGAY; JORDAN BENOIT; JORDAN BETTENCOURT; BRETT A. BINGHAM; GUNNAR BORTHICK; KENNETH CLEO BOSWELL; JAMES P. BOWEN; MATTHEW BRADLEY; NICOLAS BREWTON; NICOLAUS BROOKS; RYAN S. BROWN; CASEY BRUCKLACHER; REBECCA BRUNET; GERARDO BRUING; ROBIN CALCATERRA; ROBBY CANLAS; CARLISI; COURTNEY CARMICHAEL; MATTHEW CARTWRIGHT; WAYNE CASSAR; FABIAN CERVANTES; MELVIN A. CHAMBERLAIN; TERANCE CHAPMAN; WILLIAM CHAPMAN, JR.; ANNMARIE CHESSARI; DAVID CHITWOOD; GEORGE COBB; LORI LYNN CODY; KEONDICE W. COOK; ANGELA

CRABTREE; CHAD CROFT; BRIAN
CROSS; NICOLAS CROUCH; THOMAS
CULBERSON; VICENT CURCI; HONDA
DAGAN; JAMES DARNELL; JANELLE
DARNELL; JASON DASILVA; JOHN
DAVIS; MARK DECASA; NICHOLE M.
DECATUR; MARTIN DELGARDILLO;
TINA DIBERNARDO; BRANDON
DOCKERY; J. D., a minor by his
father as guardian ad litem Jeremy
D.; JEREMY D.; CHRISTIAN DOERR;
IAN W. DOVE,

*Plaintiffs-Appellees*,

v.

TOKYO ELECTRIC POWER COMPANY,
INC., AKA TEPCO,

*Defendant-Appellant*,

SOLICITOR GENERAL OF THE UNITED
STATES OF AMERICA,

*Real Party in Interest*.

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted September 1, 2016
Pasadena, California
Submission Withdrawn October 26, 2016
Resubmitted June 22, 2017

Filed June 22, 2017

Before:  A. Wallace Tashima, Kim McLane Wardlaw, and
Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

## SUMMARY[*]

### Interlocutory Appeal

The panel affirmed the district court's denial of Tokyo
Electric Power Company, Inc.'s motion to dismiss a putative
class action brought by members of the U.S. Navy who allege
that they were exposed to radiation when deployed near the
Fukushima Daiichi Nuclear Power Plant as part of Operation
Tomodachi, a relief effort following the 2011 earthquake and
tsunami on Japan's northeastern coast.

The panel held that Article XIII of the Convention on
Supplementary Compensation for Nuclear Damage ("CSC")
did not strip U.S. courts of jurisdiction over claims arising out
of nuclear incidents that occurred prior to the CSC's entry
into force on April 15, 2015.

The panel held that the district court did not abuse its
discretion when it decided to maintain jurisdiction, and did
not dismiss plaintiffs' claim on international comity grounds.
First, the panel held that the district court did not abuse its

---

[*] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

discretion in weighing U.S. and Japanese interests, and in concluding that the parties' ties to the United States outweighed the fact that the alleged negligent conduct occurred in Japan. The panel noted that Japan has a strong interest in centralizing jurisdiction over Fukushima Daiichi Nuclear Power Plant-related claims, and the United States had a strong interest in maintaining jurisdiction over this in order to help promote the CSC. Second, the panel held that the district court did not abuse its discretion in finding that Japan would provide an adequate alternative forum for resolving plaintiffs' claims. Finally, the panel held that because comity is not a jurisdictional decision, it is a fluid doctrine, and the district court would be free to revisit the question should either the facts or the interests of the governments change.

The panel held that the district court did not abuse its discretion in declining to dismiss on f*orum non conveniens* grounds.

The panel held that at this stage in the litigation, it was unable to undertake the "discriminating inquiry" necessary to determine if the case presented a political question because there were outstanding basic factual questions regarding the Navy's operations during Operation Tomodachi. The panel concluded that the political question doctrine did not currently require dismissal, but Tokyo Electric Power Company was free to raise the political question doctrine again, if and when, further developments demonstrated that a political question was inextricable from the case.

The panel provided no opinion as to whether California's firefighter's rule applied to military servicemembers and, if so, whether it barred plaintiffs' claims.

**COUNSEL**

Daniel Paul Collins (argued), Rio S. Pierce, and Gregory P. Stone, Munger Tolles & Olson LLP, Los Angeles, California; Bryan H. Heckenlively, Munger Tolles & Olson LLP, San Francisco, California; for Defendant-Appellant.

Adam Cabral Bonner (argued) and Charles A. Bonner (argued), Law Offices of Bonner & Bonner, Sausalito, California; Paul C. Garner (argued), Rancho Mirage, California; John R. Edwards, Edwards Kirby, Raleigh, North Carolina; Catherine E. Edwards, Edwards Kirby, Del Mar, California; for Plaintiffs-Appellees.

**OPINION**

BYBEE, Circuit Judge:

On March 11, 2011, a 9.0 earthquake and a massive tsunami struck Japan's northeastern coast. The United States participated in a relief effort known as Operation Tomodachi (Japanese for "friend"). The plaintiffs in this putative class action lawsuit are members of the U.S. Navy who allege that they were exposed to radiation when deployed near the Fukushima Daiichi Nuclear Power Plant ("FNPP") as part of Operation Tomodachi. The earthquake and tsunami damaged the FNPP, causing radiation leaks. Plaintiffs sued Defendant Tokyo Electric Power Company, Inc. ("TEPCO"), the owner and operator of the FNPP, in the Southern District of California for negligence and other causes of action. TEPCO moved to dismiss the case on the grounds of international comity, *forum non conveniens*, the political question doctrine, and the firefighter's rule. The district court denied the motion

on all grounds, but certified its order denying TEPCO's motion to dismiss for immediate appeal under 28 U.S.C. § 1292(b). We agreed to take the interlocutory appeal. At this interlocutory stage in the proceedings, we affirm the district court's denial of TEPCO's motion to dismiss on all grounds. Further developments, however, may require the district court to revisit some of the issues that TEPCO raised in its motion to dismiss.

## I. FACTS AND PROCEDURAL HISTORY

### A. *The FNPP Meltdown*

The March 2011 earthquake and resulting tsunami were nothing short of devastating.[1] Over 15,000 deaths were reported, and there was immense damage to the region's infrastructure. Cleanup efforts continue to this day, over six years later. One of the most alarming consequences of the catastrophe was the damage to the FNPP. The incident has been described as the worst nuclear accident since Chernobyl. The FNPP consisted of six boiling water reactors. At the time of the earthquake, only units one through three were in operation. The earthquake triggered an automatic shutdown of the three operating units. Water from the tsunami, however, disabled generators necessary to cool the reactors, causing the three units to melt down and leak radiation. Plaintiffs allege that the first meltdown occurred five hours after the earthquake and that units one through three exploded that same day. They further allege that over 300 tons of contaminated water from the FNPP began seeping into the sea after the meltdown.

---

[1] We take the facts from Plaintiffs' complaint and, for our purposes, we assume them to be true.

On the afternoon of March 12, the day following the earthquake, Plaintiffs arrived off the coasts of Fukushima Prefecture aboard the aircraft carrier U.S.S. Ronald Reagan and other vessels to provide humanitarian aid. Plaintiffs allege that TEPCO promulgated false information regarding the extent of the damage to the FNPP, misleading the public, Japanese officials, and the U.S. military. They allege that TEPCO's management publicly announced that there was no danger to those participating in Operation Tomodachi, despite knowing that there was a risk of radiation exposure. Plaintiffs claim that they and U.S. military officials were unaware of the extent of the radiation leak and that they would not have been deployed as close to the FNPP had TEPCO been forthcoming about the damage. They further allege that the U.S. military would not ordinarily discover such radiation absent sufficient warning.

On March 14, two days after their arrival, Plaintiffs allege that their vessels were repositioned further away from the FNPP after U.S. officials onboard the U.S.S. Ronald Reagan detected nuclear contamination in the air and on an aircraft operating near the FNPP. "Sensitive instruments" aboard the U.S.S. Ronald Reagan discovered measurable levels of radioactivity on seventeen aircrew members returning from relief missions.

In the months following the earthquake, Japan commissioned the Fukushima Nuclear Accident Independent Investigation Commission (the "Commission") to investigate the incident. The Commission determined that the meltdown was foreseeable in light of the known tsunami risks in the region and that TEPCO and the relevant regulatory bodies failed to take adequate precautions to prevent the incident. Though the earthquake and tsunami were natural disasters,

the Commission characterized the FNPP meltdown as a "manmade" disaster. In 2013, TEPCO also allegedly admitted that it could have avoided the meltdown.

In an effort to compensate victims of the FNPP meltdown, the Japanese government developed a comprehensive scheme to deal with the millions of claims resulting from the FNPP leak, giving claimants the option to submit a claim directly to TEPCO, to the newly established Nuclear Damage Claim Dispute Resolution Center, or to a Japanese court. These avenues for relief are available to all victims, regardless of nationality. Over $58 billion has been paid out to victims of the disaster. Brief of Amicus Curiae the Government of Japan 1–2, ECF No. 23. The Japanese government has provided immense financial support to TEPCO to keep TEPCO solvent. Although Plaintiffs could have pursued their claims against TEPCO in Japan, they chose to sue in the United States.

B. *District Court Proceedings*

Each Plaintiff in the present suit alleges that he or she was exposed to radiation during Operation Tomodachi. Plaintiffs request a judgment compelling TEPCO to establish a billion-dollar fund to cover continuing medical monitoring costs. They also request damages, including lost wages, non-economic damages, and punitive damages.

In Plaintiffs' First Amended Complaint ("FAC"), they alleged that TEPCO and the Japanese government conspired to keep the extent of the radiation leak secret. They further alleged that "the U.S. Navy was lulled into a false sense of security," which led it to deploy Plaintiffs "without doing the kinds of research and testing that would have verified" the

extent of the nuclear meltdown.  The district court found that adjudicating this claim would require impermissible scrutiny of discretionary military judgments and would also require the court to evaluate communications between the U.S. and Japanese governments regarding the FNPP.  Accordingly, the district court dismissed the FAC under the political question doctrine but granted Plaintiffs leave to amend.  *Cooper v. Tokyo Elec. Power Co., Inc.* (*Cooper I*), 990 F. Supp. 2d 1035, 1039–42 (S.D. Cal. 2013).

In the Second Amended Complaint ("SAC"), Plaintiffs removed their conspiracy allegations and relied instead on allegations that TEPCO was negligent in operating the FNPP and in reporting the extent of the radiation leak.  TEPCO filed a motion to dismiss, arguing that the SAC still presented a political question because determining whether TEPCO's conduct was the proximate cause of Plaintiffs' injuries would require the court to evaluate the Navy's decision to deploy troops near the FNPP.  TEPCO also argued that, given Japan's extensive efforts to compensate FNPP victims, the SAC should be dismissed under the doctrines of international comity or *forum non conveniens.*  TEPCO further contended that the so-called firefighter's rule, which bars first responders from suing those who cause the emergency to which they respond, barred Plaintiffs' claims.

The district court denied TEPCO's motion to dismiss.[2]  Shortly thereafter, TEPCO filed a motion for reconsideration

---

[2] The SAC contained ten causes of action, including claims for negligence, strict liability, nuisance, and intentional infliction of emotional distress.  The district court granted TEPCO's motion to dismiss with respect to Plaintiffs' claims of design defect and intentional infliction of emotional distress but let the remaining eight causes of action proceed.

in light of our opinion in *Mujica v. AirScan, Inc.*, 771 F.3d 580 (9th Cir. 2014), which provided additional guidance to district courts on how to determine whether to dismiss a case on international comity grounds.  The district court granted TEPCO's motion for reconsideration, but again denied TEPCO's motion to dismiss.  *Cooper v. Tokyo Elec. Power Co., Inc.* (*Cooper II*), 166 F. Supp. 3d 1103 (S.D. Cal. 2015). The district court concluded that the SAC's restyling of Plaintiffs' claims no longer implicated any political questions because it focused on TEPCO's negligence rather than the military's decision to deploy troops.  *Id.* at 1117–24.  The district court also rejected TEPCO's alternative theories for dismissal.  *Id.* at 1126–28, 1130–40.  Per TEPCO's request, the district court certified the issues for immediate appeal under 28 U.S.C. § 1292(b).  *Id.* at 1141–43.

C.  *Appellate Proceedings*

On appeal, TEPCO urges us to reverse the district court's determinations regarding international comity, *forum non conveniens*, the political question doctrine, and the firefighter's rule.  The government of Japan, which had expressed no views on the location of this litigation to the district court, also filed an amicus brief urging us to reverse the district court's decision and order the district court to dismiss Plaintiffs' claims so that Plaintiffs can pursue their claims in Japan.  In its brief, the Japanese government expresses concern that foreign lawsuits such as Plaintiffs' could threaten the viability of Japan's continuing efforts to ensure that all FNPP victims receive fair compensation.

In light of Japan's brief, we solicited the United States Department of State's views on whether this litigation should proceed in the United States.  In response, the United States

filed an amicus brief arguing that the district court did not err in allowing Plaintiffs' claims to proceed for the time being. Specifically, the United States opines that allowing Plaintiffs' lawsuit to continue in the United States is consistent with U.S. efforts to promote the Convention on Supplementary Compensation for Nuclear Damage ("CSC").

The parties each filed supplemental briefs in response to the United States' position. General Electric Co. ("GE")[3] also filed an amicus brief responding to the United States' argument that maintaining jurisdiction will help promote the CSC. Both TEPCO and GE argue that, although it did not enter into force until after Plaintiffs' litigation was already pending, the CSC strips all U.S. courts of jurisdiction over claims arising out of the FNPP incident. If correct, TEPCO and GE's argument undermines the United States' position that maintaining jurisdiction in the United States will help promote the CSC and provides an independent basis for dismissing Plaintiffs claims.

## II. ANALYSIS

We begin by addressing whether the CSC strips U.S. courts of jurisdiction over Plaintiffs' claims.[4] We then

---

[3] GE is a defendant in the district court but not a party to this appeal. Plaintiffs claim that GE is liable for defectively designing the FNPP's reactors.

[4] GE raised this argument in the district court, but the district court has yet to rule on it. Because TEPCO and GE's argument questions our jurisdiction, we may consider it in the first instance on appeal. *See Allstate Ins. Co. v. Hughes*, 358 F.3d 1089, 1093 (9th Cir. 2004) ("The court has a continuing obligation to assess its own subject-matter jurisdiction . . . .").

address TEPCO's arguments regarding international comity, *forum non conveniens*, the political question doctrine, and the firefighter's rule.

## A.  *Jurisdiction Under the CSC*

The CSC is an attempt to create "a worldwide liability regime" for dealing with nuclear accidents.  Convention on Supplementary Compensation for Nuclear Damage, Preamble, *opened for signature* Sept. 29, 1997, S. Treaty Doc. No. 107-21 (2002) [hereinafter CSC].  One of the main goals of such a regime is to control the nuclear energy industry's liability exposure, thus ensuring the continuing viability of the industry, while at the same time ensuring compensation for victims of nuclear accidents.  Prior to the CSC, there were two major conventions addressing liability for nuclear accidents:  the Paris Convention on Third Party Liability in the Field of Nuclear Energy of July 1960 and the Vienna Convention on Civil Liability for Nuclear Damage of May 1963.  Both of these conventions included a number of provisions aimed at compensating victims of nuclear accidents while keeping the nuclear energy industry viable, such as imposing strict liability on operators of nuclear installations, requiring those operators to maintain insurance in certain amounts, permitting countries to cap the liability of nuclear installation operators, requiring countries to fund compensation for nuclear damage should private insurance be inadequate, and centralizing jurisdiction over claims arising out of nuclear incidents in the country where the nuclear incident occurred.  Vienna Convention on Civil Liability for Nuclear Damage arts. II, V, VII, XI, May 21, 1963, 1063 U.N.T.S. 266; Paris Convention on Third Party Liability in the Field of Nuclear Energy arts. 6–7, 10, 13, 15, July 29, 1960, 956 U.N.T.S. 251.  The United States was not a party

to either of these conventions, but enacted similar measures in the Price-Anderson Nuclear Industries Indemnity Act of 1957. *See* 42 U.S.C. § 2210.

To join the CSC, a country must be a party to the Vienna or Paris Conventions or have laws (such as the Price-Anderson Act) that meet the requirements set forth in the CSC's annex. The CSC builds upon these prior conventions and national laws by creating an international supplementary compensation fund for victims of nuclear incidents. Under the CSC, contracting countries are required to ensure the availability of a certain amount of funds to compensate victims of a nuclear incident that occurs within their territories. CSC art. III. Beyond that amount, the contracting countries will contribute to a supplemental compensation fund. *Id.* Like the Paris and Vienna Conventions, the CSC also provides that "jurisdiction over actions concerning nuclear damage from a nuclear incident shall lie only with the courts of the Contracting Party within which the nuclear incident occurs." *Id.* art. XIII(1).

The CSC was set to enter into force ninety days after "the date on which at least 5 States with a minimum of 400,000 units of installed nuclear capacity" ratified it. CSC art. XX(1). The CSC opened for signature on September 29, 1997, at which time the United States signed it. *See* Int'l Atomic Energy Agency, Status Report on the Convention on Supplementary Compensation for Nuclear Damage (2016). The United States ratified the CSC in May 2008, *id.*, but it was not until Japan signed and ratified the CSC on January 15, 2015, almost four years after the FNPP incident, that there were enough parties to put the CSC into effect. Ninety days later on April 15, 2015, the CSC entered into force, almost two-and-a-half years after Plaintiffs first filed this suit. *Id.*

TEPCO and GE do not argue that the entirety of the CSC applies to the FNPP incident. Rather, they acknowledge the general principle that "[u]nless a different intention appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party." Vienna Convention on the Law of Treaties art. 28, May 23, 1969, 1155 U.N.T.S. 331.[5] Based on this principle, TEPCO and GE accept that the CSC's supplemental fund is unavailable for nuclear incidents occurring before the CSC's entry into force, including the FNPP incident. Appellant's Opening Brief 28, ECF No. 14; Appellant's Supplementary Brief 10, ECF No. 98; Brief of Amicus Curiae GE 11, ECF No. 96. TEPCO and GE maintain, however, that Article XIII's mandate that "jurisdiction over actions concerning nuclear damage from a nuclear incident shall lie only with the courts of the Contracting Party within which the nuclear incident occurs" applies to cases pending before the CSC entered into force.

This is so, TEPCO and GE argue, because jurisdictional provisions are not subject to limits on retroactive application. In support of this contention, TEPCO and GE cite a long list of cases explaining that jurisdictional provisions do not retroactively alter substantive rights, but only alter where plaintiffs can go to obtain prospective relief. Accordingly,

---

[5] Although the United States is not a party to the Vienna Convention on the Law of Treaties, it acknowledges the non-retroactivity principle as an element of customary international law. United States' Brief 13 n.5, ECF No. 81; *see Mora v. New York*, 524 F.3d 183, 196 n.19 (2d Cir. 2008) ("The Department of State considers the Vienna Convention on the Law of Treaties an authoritative guide to current treaty law and practice.").

TEPCO and GE argue that jurisdiction-stripping provisions such as the one at issue here presumptively apply to pending cases. *See*, *e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) ("We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed. . . . Application of a new jurisdictional rule usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.'" (citation omitted)); *Bruner v. United States*, 343 U.S. 112, 116–17 (1952) ("This rule—that, when a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall with the law—has been adhered to consistently by this Court."); *Duldulao v. INS*, 90 F.3d 396, 399 (9th Cir. 1996) ("The Supreme Court has long held that 'when a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall within the law.'" (citation omitted)). TEPCO and GE also argue that the same principle applies to jurisdictional provisions in treaties. *See*, *e.g.*, *Third Report on the Law of Treaties*, [1964] 2 Y.B. Int'l L. Comm'n 11, U.N. Doc. A/CN.4/167 (suggesting that certain jurisdictional provisions in treaties apply to any "dispute which *exists* between the parties after the coming into force of the treaty" regardless of whether "the dispute concerns events which took place prior to that date."). In short, because the courts of Japan are undisputedly open to Plaintiffs, and because Article XIII makes no reservation as to pending cases, TEPCO and GE argue that the CSC strips us of jurisdiction over Plaintiffs' claims.

We find this argument plausible, but ultimately unpersuasive. Although jurisdictional provisions can and often do apply to cases already pending when those provisions go into effect, it is not true that we always apply

new jurisdictional provisions to pending cases.  Rather, we look at the jurisdiction-stripping provision in the context of the statute or treaty at issue, applying normal canons of construction, to determine if the provision should apply to pending cases.  *Hamdan v. Rumsfeld*, 548 U.S. 557, 577 (2006) ("[Not] all jurisdiction-stripping provisions—or even all such provisions that truly lack retroactive effect—must apply to cases pending at the time of their enactment. '[N]ormal rules of construction,' including a contextual reading of the statutory language, may dictate otherwise." (second alteration in original) (citation omitted)); *Lindh v. Murphy*, 521 U.S. 320, 326 (1997) ("In determining whether a statute's terms would produce a retroactive effect, however, and in determining a statute's temporal reach generally, our normal rules of construction apply."); *see also Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180 (1982) ("The clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.'" (citation omitted)).

Applying normal rules of construction to Article XIII, we do not believe that it strips U.S. courts of jurisdiction over claims arising out of nuclear incidents that occurred prior to the CSC's entry into force.[6]   Two things bring us to this

---

[6] For purposes of this analysis, we will assume that Article XIII is self-executing.  *See Medellin v. Texas*, 552 U.S. 491, 505–06 (2008) (explaining that a treaty "ordinarily 'depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it,'" but that some treaties "contain[] stipulations which are self-executing, that is, . . . they have the force and effect of a legislative enactment" (citation omitted)); Letter of Submittal for the Convention on Supplementary Compensation for Nuclear Damage at XV, August 7, 2001, S. Treaty Doc. No. 107-21 ("As with similar jurisdictional

conclusion. First, starting with Article XIII's text, we find it informative that the CSC gives exclusive jurisdiction to "the courts of the Contracting Party within which the nuclear incident *occurs*." CSC art. XIII(1) (emphasis added). The use of the present tense suggests that the provision applies to future nuclear incidents and does not include past incidents. One would expect the drafters to have used the past tense had they intended to alter jurisdiction over claims arising out of nuclear incidents that occurred before the CSC's entry into force. Other paragraphs within Article XIII also use the present tense, similarly indicating that Article XIII refers only to claims arising out of future nuclear incidents. *See id.* art. XIII(2) ("Where a nuclear incident *occurs* within the area of the exclusive economic zone of a Contracting Party[,] . . . jurisdiction over actions concerning nuclear damage from that nuclear incident shall, for the purposes of this Convention, lie only with the courts of that Party." (emphasis added)); *id.* art. XIII(3) ("Where a nuclear incident *does not occur* within the territory of any Contracting Party[,] . . . jurisdiction over actions concerning nuclear damage from the nuclear incident shall lie only with the courts of the Installation State." (emphasis added)).[7]

---

provisions in earlier treaties submitted to the Senate for advice and consent to ratification, it is anticipated that the provisions of Article XIII would be applied without the need for further implementing legislation."). Because we conclude that, in any event, Article XIII does not apply to claims arising out of the FNPP incident, we need not decide this issue.

[7] TEPCO and GE counter that versions of the CSC in other languages, which are equally authentic, *see* CSC art. XXVII, use different verb tenses. The Spanish text, for example, uses the phrase "haya ocurrido." "Haya" is the present subjunctive form of the Spanish verb "haber," which in English means "to have." As TEPCO and GE note, the phrase "haya ocurrido" means "has occurred." In other words, the Spanish text grants jurisdiction to the courts of the country where the nuclear incident "has

Second, the CSC's overall framework also supports our conclusion that Article XIII does not apply to claims arising out of nuclear incidents that precede the CSC's entry into force because we view the promise of exclusive jurisdiction as a *quid pro quo* for establishing a compensation fund. To accept TEPCO and GE's argument that the CSC's jurisdictional provision applies to the current case, we would have to view Article XIII as a stand-alone provision, independent of the CSC's remaining provisions, to centralize jurisdiction over nuclear damage claims in a single country. We cannot fairly construe the CSC in this manner. Article XIII is but one component of the compensation scheme created in the CSC. The CSC's title—The Convention on *Supplementary Compensation* for Nuclear Damage—suggests what the remainder of the document makes clear: the CSC is, first and foremost, concerned with creating an international backstop for funding claims by victims of nuclear incidents.

---

occurred," not where it "occurs." TEPCO and GE suggest that this difference precludes us from giving much weight to the English text's use of the present tense.

We think that TEPCO and GE's reliance on the Spanish text is misplaced. The Spanish text's use of the phrase "haya ocurrido"—a subjunctive form that conveys a mood of indeterminancy that has no direct English counterpart—does not necessarily suggest that the CSC's jurisdictional provision encompasses pre-existing nuclear incidents. Even if the CSC used the past tense and limited jurisdiction to "the courts of the Contracting Party within which the nuclear incident *occurred*," that would not answer the question at issue here. In that case, the use of the past tense only shows the temporal relationship between the nuclear accident and the lawsuit, the former obviously preceding the latter. But this wording leaves open the question whether the nuclear accident had to occur after the CSC's entry into force for the provision to apply. Even if other languages make the answer to that question ambiguous, our second point above compels our conclusion that the CSC only applies to nuclear incidents occurring after the CSC's entry into force.

The "Purpose and Application" section reinforces that "[t]he purpose of this Convention is to supplement the system of compensation provided pursuant to" the Vienna and Paris Conventions and national laws such as the Price-Anderson Act. CSC art. II(1). To carry out its goal, the CSC creates what the CSC itself refers to as a "system," *id.* art. II(2), or a "worldwide liability regime," *id.*, Preamble. Nothing in the CSC suggests that one component of that system, such as the jurisdictional provision at issue here, would apply when the entire system does not. The jurisdictional provision is not independent of the compensation scheme, but is part of the mechanism for effectuating that scheme.

Other provisions of the CSC confirm our reading that Article XIII is not an independent agreement to centralize litigation from a nuclear accident in a single country, but a mechanism for administering the supplemental compensation fund. A country whose courts have jurisdiction under Article XIII obtains certain rights and responsibilities. Specifically, "the Contracting party whose courts have jurisdiction shall inform the other Contracting Parties of a nuclear incident as soon as it appears that" domestic funds may be insufficient to compensate victims. *Id.* art. VI. Once domestic funds are exhausted, "the Contracting Party whose courts have jurisdiction shall request the other Contracting Parties to make available" the supplemental compensation fund, and "the Contracting Party whose courts have jurisdiction" has "exclusive competence to disburse such funds." *Id.* art. VII(1); *see also id.* art. X(1) ("The system of disbursement by which the [supplemental funds] are to be made available and the system of apportionment thereof shall be that of the Contracting Party whose courts have jurisdiction."). "The Contracting party whose courts have jurisdiction" may also exercise certain rights of recourse under the CSC. *Id.* art.

IX(3).  Article XIII is more than just an agreement to centralize jurisdiction in one country; it is integral to the CSC's overall "system" for implementing the supplemental fund.

Our interpretation of Article XIII also finds support in a letter from Secretary of State Colin Powell submitting the CSC to President George W. Bush.  That letter provides an article-by-article explanation of the CSC.  It explains that the CSC "requires that all claims resulting from *a covered nuclear incident* be adjudicated in a single forum."  Letter of Submittal for the Convention on Supplementary Compensation for Nuclear Damage at VII, Aug. 7, 2001, S. Treaty Doc. No. 107-21 [hereinafter Letter of Submittal] (emphasis added).  It further provides that "after the United States deposits its instrument of ratification to the CSC, the effect of Article XIII will be to remove jurisdiction from all U.S. Federal and State courts over cases concerning nuclear damage from a nuclear incident *covered by the CSC* except to the extent provided in the CSC."  *Id.* at XV (emphasis added); *see also id.* at XIV ("Article XIII determines which Party's courts shall have jurisdiction over claims *brought under the CSC* . . . ." (emphasis added)).  In our view, the phrases "covered nuclear incident" and "nuclear incident covered by the CSC" most logically refer to nuclear incidents subject to all of the CSC's terms, and in particular to nuclear incidents that are eligible for the supplemental compensation fund. Thus, the United States' view at the time of ratification appears to be that Article XIII applies only to nuclear incidents occurring after the CSC's entry into force.  That is also the view that the United States expresses in its amicus

brief. We owe deference to this view.[8] *Sumitomo Shoji Am., Inc.*, 457 U.S. at 184–85 ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").

The CSC's text, structure, and ratification history dictate that Article XIII's jurisdiction-stripping provision applies only to claims arising out of nuclear incidents occurring after the CSC's entry into force. We conclude, therefore, that the CSC does not strip us of jurisdiction over Plaintiffs' claims.

B.  *International Comity*

TEPCO next contends that the district court erred by not dismissing Plaintiffs' claims on comity grounds. We review the district court's international comity determination for an abuse of discretion and will reverse only if the district court applies an incorrect legal standard or if its "application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Mujica v. AirScan Inc.*, 771 F.3d 580, 589 (9th Cir. 2014) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)).

---

[8] We also note that Japan filed an amicus brief in this appeal urging the court to dismiss Plaintiffs' claims, but did not cite the CSC as a basis for that request. The amicus brief was filed in February 2016, almost one year after the CSC's entry into force. Presumably, had Japan felt entitled to exclusive jurisdiction over Plaintiffs' claims pursuant to the CSC, it would have said so. "When the parties to a treaty both agree as to the meaning of a treaty provision, and that interpretation follows from the clear treaty language, we must, absent extraordinarily strong contrary evidence, defer to that interpretation." *Sumitomo Shoji Am., Inc.*, 457 U.S. at 185.

"International comity 'is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.'" *Id.* at 597 (quoting *In re Simon*, 153 F.3d 991, 998 (9th Cir. 1998)). There are two kinds of international comity: prescriptive comity (addressing the "extraterritorial reach of federal statutes") and adjudicative comity (a "discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state"). *Id.* at 598–99. This case concerns the latter.

District courts deciding whether to dismiss a case on comity grounds are to weigh (1) "the strength of the United States' interest in using a foreign forum," (2) "the strength of the foreign governments' interests," and (3) "the adequacy of the alternative forum." *Id.* at 603 (quoting *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)). Here, the district court correctly laid out this legal standard, and the only question is whether the district court's decision not to dismiss Plaintiffs' claims was illogical, implausible, or unsupported by the record. Although this is a close case with competing policy interests, we hold that the district court did not abuse its discretion in deciding to maintain jurisdiction. For our convenience, we will discuss together the interests of the United States and Japan. We then consider the adequacy of a Japanese forum.

1.   U.S. and Japanese interests

In *Mujica*, we expounded on how to assess the United States' and foreign governments' interests:

> The (nonexclusive) factors we should
> consider when assessing [each country's]
> interests include (1) the location of the
> conduct in question, (2) the nationality of the
> parties, (3) the character of the conduct in
> question, (4) the foreign policy interests of the
> [countries], and (5) any public policy
> interests.

*Id.* at 604, 607. The district court determined that because the
FNPP incident occurred in Japan, Japan has a strong interest
in this litigation. On the other hand, the district court
reasoned that Plaintiffs are U.S. servicemembers, suggesting
that the United States also has an interest in this litigation. In
balancing the first two factors, the district court concluded
that the parties' ties to the United States outweighed the fact
that the allegedly negligent conduct occurred Japan. We
agree with the district court that, at least with respect to the
first two factors, there are competing interests. Under these
facts, we find these considerations not particularly helpful in
determining whether to dismiss Plaintiffs' claims.

With respect to the character of the conduct in question,
the district court determined that the factor was neutral. The
court found that Japan had an interest in regulating its nuclear
utilities and compensating those injured by the FNPP
incident, but that the United States also had an "interest in the
safe operation of nuclear power plants around the world,
especially when they endanger U.S. citizens." *Cooper II*,
166 F. Supp. 3d at 1138. The district court also rejected
TEPCO's argument that the foreign policy interests of Japan
and the United States favored a Japanese forum. TEPCO
argued that the CSC's jurisdiction-channeling provision, even
if not applicable of its own force, reflected a policy judgment

of centralizing claims arising out of nuclear incidents in the courts of the country where the nuclear incident occurred. The district court gave little weight to the CSC because it saw no evidence that maintaining jurisdiction would create friction between the United States and Japan[9] and because the CSC's supplemental fund is unavailable to Plaintiffs. Finally, the district court found that there were public policy considerations cutting both in favor of and against dismissing the case.

One of the reasons the district court cited for maintaining jurisdiction was that neither Japan nor the United States had expressed an interest in the location of this litigation. Indeed, a foreign country's request that a United States court dismiss a pending lawsuit in favor of a foreign forum is a significant consideration weighing in favor of dismissal. *See Jota v. Texaco, Inc.*, 157 F.3d 153, 160 (2d Cir. 1998) ("[I]nherent in the concept of comity is the desirability of having the courts of one nation accord deference to the official position of a foreign state, at least when that position is expressed on matters concerning actions of the foreign state taken within or with respect to its own territory."). By contrast, when the

---

[9] TEPCO suggests that the district court misstated the law by requiring a showing that maintaining jurisdiction would create diplomatic friction between the United States and Japan. We do not view the district court's opinion to suggest that actual diplomatic friction is a prerequisite for dismissing a case on international comity grounds. *See Cooper II*, 166 F. Supp. 3d at 1139 (noting the lack of evidence that maintaining jurisdiction would harm U.S.-Japanese relations as one consideration). Although not a prerequisite for international comity, whether maintaining jurisdiction would harm the United States' relationship with a foreign country is certainly a relevant consideration. *See Mujica*, 771 F.3d at 609 (considering the United States' interest in preserving its diplomatic relationship with Colombia).

country in question expresses no preference, the district court can take that fact into consideration. *See Abad v. Bayer Corp.*, 563 F.3d 663, 668 (7th Cir. 2009) (finding it relevant that neither the United States nor Argentina took a position on where litigation should proceed).

Although Japan took no position in the district court,[10] Japan has not remained silent on appeal. The government of Japan submitted an amicus brief urging us to reverse the district court. In its amicus brief, Japan presents a compelling case that FNPP-related claims brought outside of Japan threaten the viability of Japan's FNPP compensation scheme. In dealing with claims arising out of the FNPP incident, Japan has developed a set of universal guidelines applicable to all claims brought in Japan. If Plaintiffs' lawsuit and others like it are permitted to proceed in foreign countries, those courts might apply different legal standards, which could result in different outcomes for similarly situated victims. That risk is especially troublesome to Japan because the Japanese government finances TEPCO's compensation payments, which are being administered through Japanese courts. As Japan explained in its amicus brief, "The irony of the situation is that this U.S. lawsuit against TEPCO is possible only because the Government of Japan, as part of its compensation system, ensured TEPCO's solvency, including by providing ongoing funds for damage payments." Brief of Amicus Curiae the Government of Japan 3–4. Judgments originating in American courts may well be inconsistent with the overall administration of Japan's compensation fund. In

---

[10] The record reflects that the Japanese government informed the State Department of its objection to U.S. jurisdiction while litigation was pending in the district court, but did not express its views to the district court.

light of Japan's justifiable insistence that we direct Plaintiffs to Japanese courts, we might well have either reversed the district court's decision to maintain jurisdiction or remanded to the district court for further consideration.

Because we became aware of Japan's position by way of an amicus brief on appeal, concerns of fairness and thoroughness led us to seek the State Department's views. We asked for a Statement of Interest. In lieu of a Statement of Interest, the United States submitted an amicus brief in support of affirming the district court's order. In its brief, the United States expressed that it "has no clear independent interest in Japan's compensation scheme beyond [its] general support for Japan's efforts to address the aftermath of Fukushima." United States' Brief 12, ECF No. 81. That alone would not be enough for us to conclude that the comity doctrine does not apply to this case. But the United States also makes a much more important point about U.S. interests: allowing the suit to continue in California is consistent with U.S. interests in promoting the CSC.

The United States has a strong interest in promoting the CSC's widespread acceptance. As explained above, the CSC was designed as a global liability regime for handling claims arising out of nuclear incidents, and its effectiveness naturally depends on global, or at least widespread, adherence.[11] The

---

[11] Unlike the Paris and Vienna Conventions, the CSC is designed to attract even countries that do not generate nuclear power. Letter of Submittal at VIII. Specifically, the CSC requires that fifty percent of the supplemental compensation fund be used to compensate damage occurring outside of the installation state, including damage occurring in a non-nuclear power generating country. CSC art. XI(1)(b). This incentive for non-nuclear power generating countries was designed to create "for the

CSC creates an international compensation fund to supplant domestic funding for victims of nuclear incidents. CSC arts. III, IV. The CSC cannot provide the robust supplemental compensation fund it was intended to provide if only a few countries contribute to the fund. The CSC also grants contracting parties exclusive jurisdiction over actions concerning nuclear incidents that occur within their borders. CSC art. XIII. But this grant of exclusive jurisdiction has little value if it binds only a few countries. In short, the CSC cannot be the global liability system it was intended to be without widespread adherence, particularly from developed nations. *See* Letter of Transmittal for the Convention on Supplementary Compensation for Nuclear Damage at IV, Nov. 15, 2002, S. Treaty Doc. No. 107-21 ("[U]nder existing nuclear liability conventions many potential victims outside the United States generally have no assurance that they will be adequately or promptly compensated in the event they are harmed by a civil nuclear incident, especially if that incident occurs outside their borders or damages their environment. The Convention, *once widely accepted*, will provide that assurance." (emphasis added)); *see also* Letter of Submittal at VIII–IX ("[T]he CSC can strengthen U.S. efforts to improve nuclear safety, because, *once widely accepted*, the CSC will eliminate ongoing concerns on the part of U.S. suppliers of nuclear safety equipment and technology that they would be exposed to damage claims by victims of a possible future accident at a facility where they have provided assistance." (emphasis added)).

Thus, the United States, as a party to the CSC, has a strong interest in encouraging other countries, especially

first time the potential for a nuclear liability convention that will apply globally." Letter of Submittal at VIII.

those with large nuclear industries such as Japan, to join the CSC. As we have discussed, one of the perquisites of joining the CSC is the guarantee of exclusive jurisdiction over nuclear incidents vis-à-vis other contracting parties. *See supra* Section II.A. If a country knew it could receive the benefit of the exclusive jurisdiction provision by becoming a party to the CSC after a nuclear incident has occurred within its borders (as Japan did here), or even avoid foreign jurisdiction altogether by virtue of international comity, there would be less incentive to join the CSC before a nuclear incident occurs. As the State Department advised us in its brief:

> The exclusive jurisdiction provision forms part of a bargain in exchange for robust, more certain and less vexatious (*e.g.*, the application of strict liability without need to establish fault) compensation for victims of a potential incident. United States policy does not call for advancing one element of this system in isolation from the other elements of the Convention's system.

> For these two inextricably interrelated interests to be fully realized, it is essential that the Convention be as widely adhered to internationally as possible. Thus, broad international adherence to the Convention is the ultimate U.S. policy goal.

United States' Brief 6–7. Accordingly, "[t]he United States has no specific foreign policy interest necessitating dismissal in this particular case." *Id.* at 17. We understand the position of the United States to be that, faced with the reality that there

is no guarantee of exclusive jurisdiction outside of the CSC, more countries will accede to the CSC, thus fostering the global liability regime the CSC was designed to create. Indirectly, this suit makes the case—and Japan has become the poster child—for why recalcitrant countries should join the CSC.

In its supplemental brief in response to the United States' brief, TEPCO argues that the United States has misapprehended its own foreign policy interests. In support of this rather bold assertion, TEPCO repeats its argument made in the district court that the CSC merely codified the longstanding U.S. policy of centralizing jurisdiction over claims from nuclear accidents in a single forum. TEPCO points to State Department testimony before the Senate that, even before the CSC, the State Department "would expect that if a nuclear incident occurs overseas[,] U.S. courts would assert jurisdiction over a claim only if they concluded that no adequate remedy exists in the court of the country where the accident occurred." *Treaties: Hearing Before the S. Comm. on Foreign Relations*, S. Hearing No. 109-324, 109th Cong. 27 (2005) (statement of Warren Stern, Senior Coordinator for Nuclear Safety, Department of State). This may well have been the United States' position prior to the CSC's ratification. In hopes that other countries would do the same, the United States may have preferred that U.S. courts not exercise jurisdiction over claims arising out of foreign nuclear incidents. But that policy appears to have changed. Now that the United States has ratified the CSC, the State Department takes the position that it would prefer to keep exclusive jurisdiction as a bargaining chip to encourage other nations to join the CSC. We owe this view deference. *See Mujica*, 771 F.3d at 610 ("[S]hould the State Department choose to express its opinion on the implications of

exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy." (citation omitted)); *id.* at 607 ("[C]ourts will not extend comity to foreign proceedings when doing so would be contrary to the policies . . . of the United States." (second alteration in original) (citation omitted)).

In light of these important, competing policy interests, we conclude that the district court did not abuse its discretion in weighing U.S. and Japanese interests. Although Japan has an undeniably strong interest in centralizing jurisdiction over FNPP-related claims, the United States believes that maintaining jurisdiction over this case will help promote the CSC, an interest that encompasses all future claims arising from nuclear incidents around the globe. Competing policy interests such as these require our district court judges to make difficult judgment calls, judgment calls committed to their sound discretion. We recognize that the district court did not have the benefit of the views of Japan and the United States. We might, in this case, have remanded to the district court to review its judgment on this question in light of the briefs filed by the two governments. We are not sure why neither government decided to weigh in when the district court was considering this question. Nevertheless, the district court had before it the facts that underlie the positions taken by Japan and the United States, and we cannot say that the district court abused its discretion.

2.  Adequacy of the alternative forum

Like the district court, we have no doubt that Japan would provide an adequate alternative forum. TEPCO is certainly

subject to suit in Japanese courts, and the doors of those courts are undisputedly open to Plaintiffs. *See Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1178 (9th Cir. 2006) ("Generally, an alternative forum is available where the defendant is amenable to service of process and the forum provides 'some remedy' for the wrong at issue." (citation omitted)). We have held that district courts have not abused their discretion in holding that Japanese courts are an adequate alternative forum, despite their procedural differences with U.S. courts. *See*, *e.g.*, *Lockman Found. v. Evangelical All. Mission*, 930 F.2d 764, 768–69, 769 n.3 (9th Cir. 1991). Plaintiffs provide no evidence that Japanese courts would be inadequate aside from unsubstantiated fears of bias against foreign claimants. The district court did not abuse its discretion in finding that Japan would provide an adequate alternative forum for resolving Plaintiffs' claims.

\*\*\*

This is a difficult case that required the district court to weigh a number of complex policy considerations. Though there are strong reasons for dismissing Plaintiffs' claims in favor of a Japanese forum, the district court did not abuse its discretion in maintaining jurisdiction. Comity is not a doctrine tied to our subject matter jurisdiction. As we have explained:

> Comity is not a rule expressly derived from international law, the Constitution, federal statutes, or equity, but it draws upon various doctrines and principles that, in turn, draw upon all of those sources. It thus shares certain considerations with international principles of sovereignty and territoriality;

constitutional doctrines such as the political question doctrine; principles enacted into positive law such as the Foreign Sovereign Immunities Act of 1976; and judicial doctrines such as *forum non conveniens* and prudential exhaustion.

*Mujica*, 771 F.3d at 598 (citation omitted). Accordingly, it is a "a doctrine of prudential abstention." *Id.* Because comity is not a jurisdictional decision, comity is not measured as of the outset of the litigation; it is a more fluid doctrine, one that may change in the course of the litigation.[12] Should either the facts or the interests of the governments change—particularly the interests of the United States[13]—the district court would be free to revisit this question.

---

[12] We note that further developments in the district court may counsel in favor of dismissing Plaintiffs' lawsuit in favor of a Japanese forum. For example, the district court has yet to determine whether U.S. or Japanese law will govern Plaintiffs' claims. Which country's law applies is relevant to the international comity analysis. *See Ungaro-Benages*, 379 F.3d at 1240 (affirming a district court's decision to dismiss a case when the relevant conduct occurred in Germany and the case involved issues of German law); *cf. Mujica*, 771 F.3d at 602 ("At least in cases considering adjudicatory comity, we will consider whether there is a conflict between American and foreign law as one factor in . . . the application of comity.").

[13] Although the United States does not oppose Plaintiffs' litigation, its brief states that it has no foreign policy interest that requires dismissal "at this time." United States' Brief 3. The United States may change its position if the circumstances so merit. *See Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 756–57 (9th Cir. 2011) (en banc) (noting that the State Department initially opposed U.S. jurisdiction over claims touching on foreign relations with Papua New Guinea, but later withdrew its opposition in light of changed country conditions), *vacated on other grounds*, 133 S. Ct. 1995 (2013) (mem.).

C.  Forum Non Conveniens

The doctrine of *forum non conveniens* allows a court to dismiss a case properly before it when litigation would be more convenient in a foreign forum. *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1142 (9th Cir. 2001); *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981). "To prevail on a motion to dismiss based upon *forum non conveniens*, a defendant bears the burden of demonstrating an adequate alternative forum, and that the balance of private and public interest factors favors dismissal." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011). We review the district court's decision to grant or deny a motion to dismiss on *forum non conveniens* grounds for an abuse of discretion. *Id.* Here, the district court did not abuse its discretion in declining to dismiss this case.

1.  Adequacy of the alternative forum

The analysis used in evaluating the adequacy of an alternative forum is the same under the doctrine of *forum non conveniens* as it is under the doctrine of international comity. *Mujica*, 771 F.3d at 612 n.25. As we stated in our international comity analysis, Japan provides an adequate alternative forum for resolving Plaintiffs' claims. *See supra* Section II.B.2.

2.  Private and public interest factors

To some extent, analysis of the private and public interests factors also overlaps with the analysis under international comity. *See Mujica*, 771 F.3d at 598 (explaining the relationship between international comity and *forum non conveniens*). However, the *forum non conveniens* analysis

introduces a presumption that litigation is convenient in the plaintiff's chosen forum when a domestic plaintiff sues at home. *Carijano*, 643 F.3d at 1227. Defendants have the "heavy burden of showing that the [plaintiff's choice of] forum results in 'oppressiveness and vexation . . . out of all proportion' to the plaintiff's convenience." *Id.* (second alteration in original) (quoting *Piper*, 454 U.S. at 241).

In this case, Plaintiffs are U.S. citizens, and their decision to sue in the United States must be respected. The district court properly took Plaintiffs' choice of their home forum into consideration and did not abuse its discretion in finding that other private and public considerations did not outweigh Plaintiffs' interest in suing at home.

The private interest factors are

> (1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive.*Id.* at 1229 (citation omitted).

The district court reasonably balanced these private interest factors. The district court noted that while most of TEPCO's witnesses reside in Japan, all Plaintiffs reside in the United States. *Cooper II*, 166 F. Supp. 3d at 1132–33. It further found that it would be more difficult for Plaintiffs to travel to Japan given their alleged medical conditions. *Id.* at

1133. The district court agreed with TEPCO that most of the relevant documents and physical proof remained in Japan, and also that litigating in the United States would make it more difficult to obtain testimony from non-party witnesses located in Japan, but did not believe that these considerations outweighed Plaintiffs' interest in suing at home. *Id.* at 1133–35. In sum, "[b]ecause of the nature of international litigation, *each* side would incur expenses related to traveling and procuring witnesses in *either* forum." *Id.* at 1135 (emphasis added). This was a reasonable determination.

The public interest factors relevant to a *forum non conveniens* analysis include "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum." *Carijano*, 643 F.3d at 1232 (citation omitted). The district court also reasonably weighed the public interest factors and concluded that they were neutral. It balanced Japan's interest in centralizing litigation in Japan with the United States' interest in compensating its military servicemembers. *Cooper II*, 166 F. Supp. 3d at 1132–36. It noted that this litigation would be burdensome to either country's courts. *Id.* at 1136. This determination was neither illogical, implausible, nor unsupported by the record.

Of course, the policy considerations addressed in the international comity discussion may also be relevant here. But as we explained above, these policy considerations did not require the district court to dismiss this case on international comity grounds. Nor do they require dismissal under *forum non conveniens*. We therefore affirm the district court's decision not to dismiss Plaintiffs' claims under the *forum non conveniens* doctrine.

D.  *The Political Question Doctrine*

TEPCO next contends that the political question doctrine bars Plaintiffs' suit.  It argues that the Navy's decision to deploy Plaintiffs near the FNPP was a superseding cause of Plaintiffs' injuries, and that Plaintiffs, accordingly, cannot prove their claims without asking the court to review nonjusticiable military decisions.  The district court found that TEPCO's superseding causation defense did not render this case nonjusticiable.  *Cooper II*, 166 F. Supp. 3d at 1119–24.   We review de novo the district court's determination that the political question doctrine does not bar Plaintiffs' case.  *Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 979 (9th Cir. 2007).

1.   The political question doctrine framework

"The nonjusticiability of a political question is primarily a function of the separation of powers."  *Baker v. Carr*, 369 U.S. 186, 210 (1962).  "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision."  *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918).  The Court has cautioned, however, that "it is 'error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance.'"  *Corrie*, 503 F.3d at 982 (quoting *Baker*, 369 U.S. at 211).  Rather, courts look to a series of factors to determine whether a case presents a nonjusticiable political question.  As *Baker* explains:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217.

Typically, deciding whether a case presents a nonjusticiable political question requires the court simply to look at the complaint and apply the *Baker* factors to decide whether there are any nonjusticiable issues. Sometimes, however, and as is the case here, no political questions are apparent from the complaint's face. Plaintiffs' allegations that TEPCO, an entity unaffiliated with the United States government, was negligent in operating the FNPP do not, on their face, trigger any of the six *Baker* factors. But even when the face of a complaint does not ask the court to review a political question, issues "that are textually committed to the executive sometimes lie just beneath the surface of the case." *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d

458, 465 (3d Cir. 2013). Such may be the case when, as here, the defendant argues that the U.S. military is responsible for all or part of a plaintiff's injuries. *See id.* Because "the political question doctrine is jurisdictional in nature," we must evaluate these potential defenses and facts beyond those pleaded in the complaint to determine whether the case is justiciable. *See Corrie*, 503 F.3d at 979; *see also Harris*, 724 F.3d at 466 ("[T]o avoid infringing on other branches' prerogatives in war-time defense-contractor cases, courts must apply a particularly discriminating inquiry into the facts and legal theories making up the plaintiff's claims as well as the defendant's defenses."); *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 409 (4th Cir. 2011) ("[W]e are obliged to carefully . . . 'look beyond the complaint, and consider how [the plaintiff] might prove his claim and how [the defendant] would defend.'" (citation, emphasis, and alterations omitted)); *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1285 (11th Cir. 2009) (finding the political question doctrine applicable where "any defense mounted by [defendants] would undoubtedly cite the military's orders as the reason" for defendants' actions); *Lane v. Halliburton*, 529 F.3d 548, 565 (5th Cir. 2008) ("We must look beyond the complaint, considering how the Plaintiffs might prove their claims *and* how [the defendant] would defend.").

Thus, analyzing TEPCO's contention that the political question doctrine bars Plaintiffs' claims requires a two-part analysis. First, we must determine whether resolving this case will require the court to evaluate a military decision. Doing so requires us to consider what Plaintiffs must prove to establish their claim, keeping in mind any defenses that TEPCO will raise. If step one reveals that determining TEPCO's liability will require the court to evaluate a military

decision, step two requires us to decide whether that military decision is of a kind that is unreviewable under the political question doctrine. *See Harris*, 724 F.3d at 466 ("[A] determination must first be made whether the case actually requires evaluation of military decisions. If so, those military decisions must be of the type that are unreviewable because they are textually committed to the executive."); *Lane*, 529 F.3d at 560 ("First, [the defendant] must demonstrate that the claims against it will require reexamination of a decision *by the military*. Then, it must demonstrate that the military decision at issue . . . is insulated from judicial review." (second alteration in original) (citation omitted)).

Although we have never expressly adopted this two-part test, it is consistent with our precedent. For example, in *Corrie*, the plaintiffs were family members of individuals who were killed or injured when the Israeli Defense Forces demolished homes in the Palestinian Territories using bulldozers manufactured by a U.S. defense contractor. 503 F.3d at 977. The plaintiffs sued the defense contractor, arguing that it knew the bulldozers would be used to demolish homes in violation of international law. *Id.* Though the complaint standing alone did not appear to raise a political question, it turned out that the United States paid for each of the bulldozers sold to the Israeli Defense Forces pursuant to a congressionally enacted program giving the executive discretion to finance aid to foreign militaries. *Id.* at 978. We concluded that resolving the plaintiffs' claims would require us to evaluate the United States' decision to provide military aid because it was "difficult to see how we could impose liability on [the defense contractor] without at least implicitly deciding the propriety of the United States' decision to pay for the bulldozers which allegedly killed the plaintiffs' family members." *Id.* at 982. Having determined that evaluating the

plaintiffs' claims would require us implicitly to evaluate the United States' decision to pay for the bulldozers, we concluded that the decision "to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations." *Id.* at 983. In light of our conclusion that we could not "intrude into our government's decision to grant military assistance to Israel, even indirectly," we affirmed the district court's dismissal of the plaintiffs' claims under the political question doctrine. *Id.* at 983–84.

Because determining whether a case raises a political question requires a "discriminating inquiry into the precise facts and posture of the particular case," *Baker*, 369 U.S. at 217, it is not always possible to tell at the pleading stage whether a political question will be inextricable from the case, *see Lane*, 529 F.3d at 554. For example, in *Lane*, a defense contractor recruited the plaintiffs to drive trucks in Iraq. *Id.* While in Iraq, Iraqi insurgents attacked the plaintiffs' convoys resulting in deaths and injuries to the plaintiffs. *Id.* at 555. The plaintiffs argued that the contractor fraudulently induced them into employment by falsely representing that their work in Iraq would be entirely safe. *Id.* They also asserted that the defense contractor was negligent in carrying out the convoy. *Id.* The defense contractor argued that the case presented a nonjusticiable political question, and the district court agreed and dismissed the case. *Id.* at 555–56.

On appeal, the Fifth Circuit reversed. The court stressed that in order to dismiss a case on political question grounds, "a court must satisfy itself that [a] political question will certainly and inextricably present itself." *Id.* at 565. Though acknowledging the potential for a political question to arise

in the case, the court was not satisfied that addressing a political question would be inevitable. The plaintiffs' fraud theory, for example, might have succeeded if the plaintiffs could establish that the defense contractor guaranteed the plaintiffs' safety while knowing that the plaintiffs were at a greater risk of harm than they were led to believe. *Id.* at 567. The court also permitted the plaintiffs' negligence claims to proceed, while noting that those claims "move precariously close to implicating the political question doctrine, and further factual development very well may demonstrate that the claims are barred." *Id.* But given the lack of clarity at the pleading stage regarding what duties the defense contractor owed toward the plaintiffs while in Iraq, it was not certain that a political question was inextricable from the case. *Id.* Accordingly, the court remanded to the district court for further factual development. *Id.* at 568; *see also Carmichael*, 572 F.3d at 1279 (noting that factual developments during discovery aided the district court in determining whether a political question existed); *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1361 (11th Cir. 2007) (rejecting a defendant's arguments that the political question doctrine barred the plaintiffs' claims because it was not clear from the pleadings that a political question existed).

Another consideration that may make it difficult to determine in the early stages of litigation whether a nonjusticiable political question exists is a lack of clarity as to which state's or country's law applies. *See Harris*, 724 F.3d at 474. Deciding whether a political question is inextricable from a case necessarily requires us to know what the plaintiff must prove in order to succeed. Although there is often similarity between the tort regimes of different jurisdictions, the elements of a particular tort and the host of defenses available to the defendant can vary in significant

ways. *See id.* (contrasting the tort laws of Pennsylvania, Tennessee, and Texas). This leaves open the possibility that a political question may arise under the laws of one jurisdiction but not under the laws of another. For example, in *Harris*, the Third Circuit concluded that a political question would arise under Tennessee or Texas law because their proportional liability systems would require the court to apportion fault among all possible tortfeasors, including the military. *Id.* Doing so would require the court to determine whether a particular military decision was reasonable, which raised a political question. In contrast, under Pennsylvania's joint-and-several liability system, it would be possible to impose liability on the defense contractor without needing to apportion any fault to the military or otherwise review its decisions. *Id.* Thus, at least where the potentially applicable bodies of law differ, the district court must either decide what law applies or conclude that a political question would arise under any potentially applicable body of law before it can dismiss a case as nonjusticiable.

### 2. Analysis

At this stage in the litigation, we find ourselves unable to undertake the "discriminating inquiry" necessary to determine if this case presents a political question. *Baker*, 369 U.S. at 217. The parties have agreed, and we assume for present purposes, that the political question doctrine prevents us from evaluating the wisdom of the Navy's decision to deploy troops near the FNPP. *See Corrie*, 503 F.3d at 983 ("Whether to grant military or other aid to a foreign nation is a political decision inherently entangled with the conduct of foreign relations."); *see also Gilligan v. Morgan*, 413 U.S. 1, 10 (1973) ("The complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a

military force are essentially professional military judgments
. . . ."); *id.* ("It would be difficult to think of a clearer example
of the type of governmental action that was intended by the
Constitution to be left to the political branches . . . .
Moreover, it is difficult to conceive of an area of
governmental activity in which the courts have less
competence."); *Johnson v. Eisentrager*, 339 U.S. 763, 789
(1950) ("Certainly it is not the function of the Judiciary to
entertain private litigation—even by a citizen—which
challenges the legality, the wisdom, or the propriety of the
Commander-in-Chief in sending our armed forces abroad or
to any particular region."). In other words, step two is not in
dispute. The dispute is whether Plaintiffs' claims or
TEPCO's superseding causation defense would actually
require the court to review the wisdom of the Navy's
decisions during Operation Tomodachi.

Several considerations make it difficult for us to tell at
this stage in the proceedings whether the district court would
actually need to review the Navy's decisions. First, the
district court has yet to undergo a choice-of-law analysis, and
the parties have briefed the issue assuming California law
applies. Without knowing what body of law applies—
whether it is California law, Japanese law, federal common
law, or something else—we cannot know what Plaintiffs must
demonstrate in order to prove their claims or what defenses
are available to TEPCO. We cannot, therefore, decide with
certainty that a political question is inextricable from the
case. *See Harris*, 724 F.3d at 474–75.[14]

---

[14] TEPCO suggests that there are no material differences between the
potentially applicable bodies of law, making the choice-of-law analysis
irrelevant. In support of this argument, TEPCO cites to only a few pages
of the record providing a brief summary of how Japanese tort law

Even assuming California law applies, we are unable to conclude at this juncture that TEPCO's superseding causation defense injects a political question into this case. "California has adopted sections 442–453 of the Restatement of Torts, which define when an intervening act constitutes a superseding cause." *USAir Inc. v. U.S. Dep't of Navy*, 14 F.3d 1410, 1413 (9th Cir. 1994). Section 442 of the Restatement lays out several considerations used to determine whether an intervening force is a superseding cause. Restatement (Second) of Torts § 442 (Am. Law Inst. 1965). The parties primarily discuss two such considerations. First, determining whether the Navy's actions were a superseding cause of Plaintiffs' injuries will require the district court to determine whether the Navy's actions were foreseeable as a result of TEPCO's negligence. As we have explained our understanding of California law,

> [a] superseding cause must be something more than a subsequent act in a chain of causation; it must be an act that was not reasonably foreseeable at the time of the defendant's negligent conduct. Moreover, even if the intervening act is negligent, it is not a superseding cause if the first actor should have known that a third person might so act.

---

addresses causation. Aside from that, the parties have not briefed the choice of law issue. TEPCO may well be correct that the political question doctrine will bar review irrespective of the choice of law, but we will defer consideration of the matter until after the parties fully brief the issue in the district court and the district court makes a determination in the first instance.

*USAir Inc.*, 14 F.3d at 1413 (citations omitted). Even when a third party acts negligently, it may not relieve the defendant of its own negligence where the defendant could have anticipated the acts of the third party. Rather, in that circumstance there is "concurrent or contributory causation, where both wrongful acts were necessary conditions of the harm. That there was more than one proximate or legal cause of the accident is important only for the district court's apportionment of damages." *Id.* at 1414 (citations omitted).

The district court ruled that it was foreseeable that Plaintiffs and other foreign responders would be in the area to provide aid in the wake of the earthquake and tsunami. *Cooper II*, 166 F. Supp. 3d at 1121. TEPCO argues, and we agree, that the proper inquiry is not whether it was foreseeable that Plaintiffs would be in the area, but whether TEPCO, in anticipation of its alleged negligence, could have foreseen the Navy's actions in response. Only if TEPCO could not have foreseen the Navy's actions and the Navy's actions caused the Plaintiffs' injuries would the Navy's conduct break the chain of proximate causation. But deciding whether a particular military action was *"reasonably foreseeable"* is not the same as requiring an evaluation of whether that action was itself *reasonable*. We cannot begin to resolve these questions at this stage in the litigation because there are basic factual disputes regarding the Navy's operations during Operation Tomodachi.[15] We agree with the

---

[15] TEPCO makes much of Plaintiffs' allegations that the U.S.S. Ronald Reagan was initially positioned "two miles off the coast," while the Navy had been warned to stay at least "50 miles outside of the radius . . . of the [FNPP]." Appellant's Opening Brief 7. The SAC alleges, however, that the U.S.S. Ronald Reagan was situated so as to provide relief in the city of Sendai, which is located over fifty miles north of the FNPP. Thus, it is possible that the U.S.S. Ronald Reagan was at once two

district court that it may "hear evidence with respect to where certain ships were located and what protective measures were taken" without running afoul of the political question doctrine. *Cooper II*, 166 F. Supp. 3d at 1123; *see Harris*, 724 F.3d at 473 ("[T]he submission of evidence related to strategic military decisions that are necessary background facts for resolving a case . . . is not sufficient to conclude that a case involves an issue textually committed to the executive.").

Second, TEPCO relies on § 452(2) of the Restatement (Second) of Torts, which provides: "Where, because of lapse of time or otherwise, the duty to prevent harm to another threatened by the actor's negligent conduct is found to have shifted from the actor to a third person, the failure of the third person to prevent such harm is a superseding cause." This provision

> covers the exceptional cases in which, because the duty, and hence the entire responsibility for the situation, has been shifted to a third person, the original actor is relieved of liability for the result which follows from the operation of his own negligence. The shifted responsibility means in effect that the duty, or obligation, of the original actor in the matter has terminated,

---

miles off the coast and fifty miles away from the FNPP. Although other portions of the SAC suggest that the U.S.S. Ronald Reagan was closer to the FNPP, where the U.S.S. Ronald Reagan was situated is unclear from the record before us, and further factual development is necessary to resolve this issue.

> and has been replaced by that of the third
> person.

Restatement (Second) of Torts § 452 cmt. d. Even assuming
TEPCO is correct that the duty to protect Plaintiffs shifted
from TEPCO to the Navy,[16] it is not clear that determining
whether the duty shifted would raise a political question. A
determination that someone other than TEPCO bore the
responsibility for Plaintiffs' safety might simply absolve
TEPCO of liability to Plaintiffs. The district court may not
have to then decide whether the Navy fulfilled its duty to
Plaintiffs.

The political question doctrine does not currently require
dismissal. As the facts develop, it may become apparent that
resolving TEPCO's superseding causation defense would
require the district court to evaluate the wisdom of the Navy's
decisions during Operation Tomodachi. But at this point, that
is not clear. Further district court proceedings will help flesh
out the contours of whatever law the district court finds
applicable. TEPCO is free to raise the political question

---

[16] The applicability of § 452(2) may hinge on facts that are not clear
from the record before us. The comments to § 452 note that "[i]t is
apparently impossible to state any comprehensive rule as to when" the
responsibility to prevent harm passes to a third person, but they list
various factors that play into the determination. Restatement (Second) of
Torts § 452 cmt. f (stating that such factors include "the degree of danger
and the magnitude of the risk of harm, the character and position of the
third person who is to take the responsibility, his knowledge of the danger
and the likelihood that he will or will not exercise proper care, his relation
to the plaintiff or to the defendant, the lapse of time, and perhaps other
considerations"). As the district court noted, the Navy's "knowledge of
the danger" is unclear at this point, as is exactly how much time passed
between the meltdown and the Plaintiffs' arrival. *Cooper II*, 166 F. Supp.
3d at 1122.

doctrine again if and when further developments demonstrate that a political question is inextricable from the case.

## E. *Firefighter's Rule*

Finally, TEPCO argues that the firefighter's rule bars Plaintiffs' claims. The firefighter's rule originated at common law and "precluded firefighters from suing those whose negligence caused or contributed to a fire that, in turn, caused the firefighter's injury or death." *Vasquez v. N. Cty. Transit Dist.*, 292 F.3d 1049, 1054 (9th Cir. 2002). Despite its name, the firefighter's rule extends to more than just firefighters. *See id.* at 1054–55. It is an open question under California law, however, whether the firefighter's rule applies to military servicemembers. The district court declined to extend the firefighter's rule beyond domestic first responders. *Cooper II*, 166 F. Supp. 3d at 1127. As with the political question doctrine, the parties have briefed this issue assuming California law will apply. We decline the invitation to rule on this issue of California law, one that may well require us to certify a question to the California Supreme Court, before the district court has determined what law applies. It is unclear whether Japanese law has a doctrine similar to the firefighter's rule, and the choice of law determination may therefore obviate the need to decide whether California would extend this common law doctrine to military servicemembers. Accordingly, we provide no opinion as to whether the firefighter's rule applies to military servicemembers and, if so, whether it bars Plaintiffs' claims.

## III.  CONCLUSION

We affirm the district court's denial of TEPCO's motion to dismiss. As the case develops more fully, however, the

district court may reconsider dismissal as a matter of comity or under the political question doctrine or state law.

**AFFIRMED.**