**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LINDSAY R. COOPER; JAMES R.
SUTTON; KIM GIESEKING; CHARLES
A. YARRIS; ROBERT M. MILLER;
CHRISTOPHER G. BITTNER; ERIC
MEMBRILA; JUDY GOODWIN;
JENNIFER L. MICKE; JOHN W.
SEELBACH; MAURICE D. ENIS; JAIME
L. PLYM; NATHAN J. PIEKUTOWSKI;
CAROLYN A. WHITE; LOUIE
VIERNES; MICHAEL L. SEBOURN;
K.S., an infant by his father and
natural guardian Michael L.
Sebourn; CHRISTIAN M. EBUENG;
PAUL J. ENCINIAS; DANIEL E. HAIR;
ADAM W. KRUTZLER; DAVID K.
MALONE; ROBERT SELIGMAN; ELOI
A. WHITEMAN; JASON D. HENRY;
NELLIE ALLEN-LOGAN; JAMI
BESCHORNER; NATHAN CANCHE;
NATHAN CRISWELL; JASON TROY
FRIEL; OSCAR GONZALEZ; DAVID
HAHN; JAMES JACKSON; JARRETT
BRADY JOHNSTON; JONATHAN
MEDINA; ADAM MINTZ; MALLORY
K. MORROW; WILLIAM NETHERTON;
MICHELLE ODEN; DONALD RAIRIGH;
CHRISTOPHER RICKARD; ANDREW
RIVERA; STEVEN RAY SIMMONS;
AKEEM SMITH; JUSTIN SPENCER;

No. 19-55295

D.C. No.
3:12-cv-03032-
JLS-MSB

OPINION

ALAN SPURLING; ANGEL TORRES;
ANTHONY GARCIA; JASMINE ALLEN;
RHONDA ANBERT; SUSAN ASH;
ADAM ARMENTA; JINKY M.A.,
individually and as the
Administrator of the Estate of
Charliemagne T.A.; J.C.A., a minor
by his mother as guardian ad litem
Jinky M.A.; J.A., a minor by his
mother as guardian ad litem Jinky
M.A.; DANA AUSTIN; RENAR AWA;
JOSH BANE; ARAMIS BARRIOS;
TREVOR BECK; MARKUS BEGAY;
JORDAN BENOIT; JORDAN
BETTENCOURT; BRETT A. BINGHAM;
GUNNAR BORTHICK; KENNETH CLEO
BOSWELL; JAMES P. BOWEN;
MATTHEW BRADLEY; NICOLAS
BREWTON; NICOLAUS BROOKS;
RYAN S. BROWN; CASEY
BRUCKLACHER; REBECCA BRUNET;
GERARDO BRUING; ROBIN
CALCATERRA; ROBBY CANLAS;
CARLISI; COURTNEY CARMICHAEL;
MATTHEW CARTWRIGHT; WAYNE
CASSAR; FABIAN CERVANTES;
MELVIN A. CHAMBERLAIN;
TERANCE CHAPMAN; WILLIAM
CHAPMAN, JR.; ANNMARIE
CHESSARI; DAVID CHITWOOD;
GEORGE COBB; LORI LYNN CODY;
KEONDICE W. COOK; ANGELA
CRABTREE; CHAD CROFT; BRIAN

CROSS; NICOLAS CROUCH; THOMAS CULBERSON; VICENT CURCI; HONDA DAGAN; JAMES DARNELL; JANELLE DARNELL; JASON DASILVA; JOHN DAVIS; MARK DECASA; NICHOLE M. DECATUR; MARTIN DELGARDILLO; TINA DIBERNARDO; BRANDON DOCKERY; J. D., a minor by his father as guardian ad litem Jeremy D.; JEREMY D.; CHRISTIAN DOERR; IAN W. DOVE; JESSE DUNN; CHRISTINA DUVALL; CHRISTIAN JOY NAGUI EBUENG; ANGEL ESCRIBANO; SETH ESLIN; NICHOLAS J. FELLER; KYLE E. FELT; TERI FORZA; JOEL FUDGE; PAUL GABBY; SHANE GALLAGHER; ZACH GARNER; JOHN OLIVER GOOCH IV; KATE GRACE; JENNIFER GUANA; M. H., a minor by Allison D. Eyring her mother as guardian ad litem; ANDREW HAJNY; ROBERT HAREWOOD; DANIEL PATRICK HARREN; JOSHUA HARRIGAN; CHAD HARRIS; ROBERT C. HARTAGE; TIFFANY HARTMAN; NICHOLAS HELMSTADT; ASHTON HEMPHILL; ERIN HERRING; CORA E. HILL; CHAD HOLT; NEIL HOPKINS; DYLAN IMGRAM; NICK INCA; JEDIDIAH IRONS; GERARDO IRVING; BLAKE ISAACS; THE ESTATE OF THEODORE H., by Manuel Leslie as the administrator of the estate of

Theodore H; JOANNA ILOILO;
DARIUS JACKSON; JESSICA JACKSON;
CHRISTIAN A. JESSUP; WILLIAM
JONES; WINSTON JONES; LEON
JULIAN; CHARLES D. KAISER;
DANIEL KREGSTEIN; ZACKARY
KUBE; SHANE M. LANGNES; DANIEL
LAWVIER; ROBERT LEHRMAN;
JULIAN LEON; MARY LOKKA;
NICOLE LOOK FANG; ALYSSA LOPEZ;
ZACKERY LOUVERS; CHRISTOPHER
LOWE; ALEJANDRO LUSK; CORA
MAE; BILLY MARKHAM; ALEX
MATIN; ALFRED MCALLISTER;
DIANNA MCCANTS; THOMAS
MCCANTS; CHENEIL MCCARTER;
TYLER MCDONALD; PETINA
MCINTOSH; RYAN MENENDEZ;
MICHAEL MESIGH; SAMY MOHANIE;
JOEL MONSALUD; LETICIA
MORALES; KEVIN MORRIS; COLIN
MORRISON; TIMOTHY MUIS; JON
NEUMANN; MARK NEWMAN; DANIEL
OLSEN, Officer; CHAD YARBROUGH;
ANTHONY J. YOVANOVIC;
JONATHAN ZAVITZ; WILLIAM
ZELLER; MICHAEL ZITELLA; MIKE
TISOY ORMAN; CHRISTOPHER
PETERSON; MATTHEW PETERSON;
ALYSSA PETTERWAY; KEITH
POTTRATZ; DANIEL PRETTO; ASHLEY
RAMIREZ; TYLER RAY RANDRUP;
SUSAN RODRIQUEZ; BRANDEN

RUCKER; W. RUSHBY; ERICA RYAN; DAVID SANCHEZ; DANE SANTO; DAISY M. SARSLOW; ROBERT SEELIGMAN; BENITO G. SERENTAS, JR.; KELLI SERIO; CHRISTOPHER SHAMRELL; MICHAEL B. SHANNON; RYAN SIVELS; JOSHUA C. SMILEY; BRANDON SMITH; FRANCES FISTER STOGA; BYRON SY; KELLY TANNEHILL; NIGEL THOMPSON; CHAD THORTON; MICHAEL TIMKO; PATRICIA TOTEMEIER; JAMES TRICE; DARREL USRY; MARK VALDEZ; OSVALDO VERA; KAILEE VICTRUM; ANDREW VODOPIJA; ANDREW VROOMAN; SKYLER STEVEN WARNOCK; TAWNY WATSON; TIMOTHY J. WENDAL; IAN LEE WHEATON; TIM WHITE; EDWARD JOSEPH WICKLE; PATRICK WIGHT; KRISTIAN WILLIAM; TIM WOELKY; JUSTIN WOMMACK; RONALD WRIGHT; KIOCHI YAMAZAKI; A. G., an infant by her mother and natural guardian Kim Gieseking,

*Plaintiffs-Appellants*,

v.

TOKYO ELECTRIC POWER COMPANY
HOLDINGS, INC., AKA TEPCO;
GENERAL ELECTRIC COMPANY;
DOES, 1–200, inclusive,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of California
Janis L. Sammartino, District Judge, Presiding

Argued and Submitted March 10, 2020
Pasadena, California

Filed May 22, 2020

Before:  A. Wallace Tashima, Kim McLane Wardlaw,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Bybee

# SUMMARY[*]

## International Comity / Choice-of-Law

The panel affirmed the district court's dismissals of claims brought in California by United States servicemembers against Tokyo Electric Power Company ("TEPCO") and General Electric Company ("GE"), alleging they were exposed to radiation from the Fukushima Daiichi Nuclear Power Plant.

The Japanese Act on Compensation for Nuclear Damage provides that the operator of a nuclear power plant is strictly liable for any damage caused by the operation of the power plant but no other person shall be liable.

GE argued that Japanese law should apply, and that under Japanese law only the plant operator, TEPCO, could be liable for injuries resulting from the power plant's failure. The panel held that Japan's Compensation Act was a liability-limiting statute with outcome-determinative implications, and was substantive for *Erie* purposes, and subject to a choice-of-law analysis. The panel also held that the district court did not err by conducting a choice-of-law analysis at the motion-to-dismiss stage of the litigation.

The panel applied California's three-step "governmental interest" test in deciding the choice-of-law questions. First, the panel held that the laws of California and Japan differed because under Japanese law, the Compensation Act would

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

limit liability to TEPCO and require dismissal of all claims against GE; but under California law, GE, as manufacturer, would be strictly liable for design defects. Second, the panel held that both jurisdictions had a legitimate interest. In addition, the panel concluded, as did the district court, that there was a "true conflict" where California had an interest in holding manufacturers of defective products liable in tort to insure compensation for its residents, while Japan had an interest in consistent application of its liability-limiting statute to businesses participating in its nuclear industry. Third, the panel held that Japan's interests would be more impaired if its law were not applied. Because there was no dispute on appeal that application of Japanese law required dismissal of all claims against GE, the panel affirmed the dismissal of those claims with prejudice.

TEPCO argued for dismissal on international-comity grounds. Plaintiffs raised the same challenges to the choice-of-law analysis for TEPCO's claims. The panel held that for the reasons previously stated, the choice-of-law analysis was not premature or inappropriate at this stage. As to the merits of the choice-of-law analysis, the district court correctly found that Japanese law applied to the plaintiffs' claims against TEPCO.

The panel proceeded to the question of whether, given that Japanese law must apply to the proceedings in the Southern District of California, the district court abused its discretion in dismissing the case on international comity grounds. In deciding whether the doctrine of adjudicative comity applied, courts weigh several factors. The panel held that it was not an abuse of discretion for the district court to take the applicability of Japanese law into consideration. The panel also held that the district court did not abuse its

discretion in considering Japan's strong interests in the case being litigated in Japan. The panel concluded that the district court did not abuse its discretion when it dismissed the claims against TEPCO on international comity grounds.

---

## COUNSEL

A. Cabral Bonner (argued) and Charles A. Bonner, Law Offices of Bonner & Bonner, Sausalito, California; John R. Edwards (argued) and Catharine E. Edwards, Edwards Kirby LLP, Raleigh, North Carolina; Paul C. Garner, Rancho Mirage, California; for Plaintiffs-Appellants.

Mark R. Yohalem (argued) and Gregory P. Stone, Munger Tolles & Olson LLP, Los Angeles, California, for Defendant-Appellee Tokyo Electric Power Company Holdings, Inc.

David J. Weiner (argued) and Sally L. Pei, Arnold & Porter Kaye Scholer LLP, Washington, D.C.; Michael D. Schissel, Arnold & Porter Kaye Scholer LLP, New York, New York; for Defendant-Appellee General Electric Company.

---

## OPINION

BYBEE, Circuit Judge:

In the aftermath of a massive earthquake and tsunami in Japan, the Fukushima Daiichi Nuclear Power Plant (FNPP) was damaged. Hundreds of United States servicemembers, deployed to provide relief to the victims, allege that they were exposed to radiation from the FNPP. The plaintiffs, servicemembers and their families, brought suit in California

for negligence and strict products liability against Tokyo Electric Power Company (TEPCO), the power plant's owner and operator, and General Electric Company (GE), the manufacturer of the plant's boiling water reactors.

This is the second time we have heard an appeal in this case. In 2017, we affirmed the district court's denial of TEPCO's motion to dismiss. *Cooper v. Tokyo Elec. Power Co.*, 860 F.3d 1193 (9th Cir. 2017) ("*Cooper III*"). On remand, GE and TEPCO both moved to dismiss. GE argued that Japanese law should apply to the case and that, under Japanese law, only the plant operator could be liable for injuries resulting from the power plant's failure. TEPCO argued for dismissal on international-comity grounds. The district court granted both motions to dismiss. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

### A. *The Act on Compensation for Nuclear Damage*

In the early 1960s, the Japanese National Diet enacted legislation "to establish a basic system pertaining to compensation for damages in the case where nuclear damage has occurred in connection with the operation . . . of a nuclear reactor" and to "provid[e] protection for injured parties and contribut[e] to the sound development of nuclear reactor operations." Act on Compensation for Nuclear Damage, Act No. 147, ch. I, art. 1 (June 17, 1961) (Compensation Act). The Compensation Act encouraged participation in Japan's nuclear industry while ensuring compensation for any persons injured through operation of nuclear power plants. Articles 3 and 4 of Chapter II of the Compensation Act provide that the operator of a nuclear plant is strictly liable for any damage caused by the operation of the power plant but that

"no other person shall be liable to compensate for damages." *Id.* at ch. II, arts. 3–4.  This is referred to as the "channeling provision."

These provisions, along with others that provide for the creation of a national insurance pool and financial backing from the Japanese government to fund compensation, work to facilitate recovery for accident victims by eliminating the need to prove fault and ensuring recovery of damages.  *Id*. at ch. III, arts. 6–9.

B.  *The 2011 Earthquake*

On March 11, 2011, a 9.0-magnitude earthquake and massive tsunami struck Japan, causing enormous and widespread destruction.[1]  Some 15,000 people died.  The FNPP was damaged by the earthquake and tsunami and released over 300 tons of contaminated water into the sea.  In response to the disaster, the United States joined in a humanitarian relief effort known as "Operation Tomodachi." The day following the earthquake, the servicemember plaintiffs arrived off the coast of Fukushima on the *U.S.S. Ronald Reagan* and other vessels participating as part of the U.S. 7th Fleet's Reagan Strike Force.

Defendant TEPCO owns and operates the FNPP.  After the FNPP meltdown, the Japanese government provided billions of dollars in financial support to TEPCO.  It also developed a comprehensive scheme to deal with the thousands of claims resulting from the FNPP leak, giving

---

[1] We have taken the facts from plaintiffs' Third Amended Complaint. Additional details may be found in our prior opinion.  *Cooper III*, 860 F.3d at 1197–98.

claimants the option to submit a claim (1) directly to TEPCO, (2) to the newly established Nuclear Damage Claim Dispute Resolution Center, or (3) to a Japanese court. The plaintiffs, however, chose to sue in the Southern District of California. Subject matter jurisdiction was asserted under the district court's diversity jurisdiction. 28 U.S.C. § 1332(a)(2).

## C. *Initial Complaints and the First Appeal*

The plaintiffs' second amended complaint (SAC) alleged that TEPCO was negligent in operating and maintaining the FNPP. Six months later, the plaintiffs moved to amend their complaint to name GE and three other manufacturer defendants, claiming they had only recently learned of their involvement. Shortly thereafter, the district court granted in part TEPCO's motion to dismiss the SAC. It found that the plaintiffs' claims were not barred by the political-question doctrine, *forum non conveniens*, or the doctrine of international comity, but granted the motion in part because the plaintiffs failed to state claims for strict design-defect liability and intentional infliction of emotional distress. *Cooper v. Tokyo Elec. Power Co.*, 2014 WL 5465347 (S.D. Cal. Oct. 28, 2014) (*Cooper I*). The court granted leave to amend, including leave to name GE and the other manufacturers as defendants.

The plaintiffs then filed their third-amended complaint (TAC) against TEPCO, GE, and three other named defendants. The TAC asserts claims for negligence, strict liability for ultrahazardous activities, res ipsa loquitur, negligence per se, loss of consortium, and survival and wrongful death against all defendants. The TAC also raises strict-liability claims for manufacturing and design defects against GE and the other named manufacturers.

GE and TEPCO separately moved to dismiss. Meanwhile, TEPCO moved for reconsideration of the denial of its motion to dismiss the SAC. The district court granted the motion for reconsideration but again denied TEPCO's motion to dismiss the SAC. *Cooper v. Tokyo Elec. Power Co.*, 166 F. Supp. 3d 1103 (S.D. Cal. 2015) (*Cooper II*). The district court certified the issues for interlocutory appeal and denied the pending motions to dismiss as moot.

On appeal, we affirmed the denial of TEPCO's motion to dismiss the SAC. *Cooper III*, 860 F.3d at 1218. We held that none of the arguments raised in TEPCO's appeal warranted dismissal at that stage of the litigation, but allowed that "[f]urther developments . . . may require the district court to revisit some of the issues." *Id.* at 1197; *see also id.* at 1210 n.12.

D. *Proceedings on Remand*

After remand from *Cooper III*, and in light of a ruling in a parallel case filed by the same plaintiffs' counsel raising similar issues, the district court relieved the defendants of the requirement to respond to the TAC and allowed the plaintiffs to file a fourth-amended complaint. The plaintiffs informed the court they would not do so, leaving the TAC as the operative complaint in this case.

GE and TEPCO filed new motions to dismiss the TAC. GE argued that it could not be held liable because, under California's choice-of-law rules, Japan's Compensation Act applied and channeled all liability to TEPCO as the FNPP's

operator.**[2]**  TEPCO argued that the court lacked personal jurisdiction, and that, even if the court had jurisdiction over it, the doctrine of international comity required dismissal.**[3]**

The district court granted both motions.  As to GE, the district court first concluded that it had subject-matter jurisdiction over the suit.  The court then, over the plaintiffs' objection, conducted a choice-of-law analysis.  It determined that Japanese law governed with respect to third-party liability and, under that law, GE could not be held liable.  As to TEPCO, the district court concluded that TEPCO had waived the personal-jurisdiction defense because it had not raised the issue in previous Rule 12 motions and there was no intervening change in the law that affected TEPCO's ability to raise the defense.  But the district court ultimately dismissed the claims against TEPCO without prejudice on international-comity grounds.

## II. ANALYSIS

The plaintiffs appealed the district court's ruling on both GE's and TEPCO's motions to dismiss.  We begin with GE's motion to dismiss before discussing TEPCO's.

---

**[2]** GE also argued that the TAC presented a political question, the claims were time-barred, the complaint should be dismissed under *forum non conveniens*, and the doctrine of international comity required dismissal.  The district court did not reach these arguments.

**[3]** TEPCO also revived its *forum non conveniens* argument before the district court, but the district court did not reach it.

A.  *GE*

The district court, after concluding under California's choice-of-law rules that Japanese law applied, dismissed all claims against GE with prejudice.  Plaintiffs do not dispute that if Japan's Compensation Act applies, their claims must be dismissed because TEPCO, as the operator, is exclusively liable under the channeling provision for any damages.  Instead, they raise three challenges to the district court's choice-of-law ruling: first, that the channeling provision in the Compensation Act is procedural, not substantive, and therefore not subject to a choice-of-law analysis; second, that it was premature to decide choice-of-law questions at this stage of litigation; and, third, that the district court's analysis was wrong and California's strict products liability law should apply to the plaintiffs' claims against GE.  We review choice-of-law questions de novo, but review underlying factual findings for clear error.  *Daewoo Elecs. Am., Inc. v. Opta Corp.*, 875 F.3d 1241, 1246 (9th Cir. 2017).  We apply California's choice-of-law rules to this claim.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

1.  Procedural Versus Substantive

A federal district court sitting in diversity jurisdiction, 28 U.S.C. § 1332, applies substantive state or foreign law. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  "The nub of the policy that underlies [*Erie*] is that for the same transaction the accident of a suit by a non-resident litigant in a federal court instead of in a State court a block away, should not lead to a substantially different result." *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 109 (1945); *see Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964) (a "change of courtrooms" should not lead to a change in the law applied to

the parties).  Accordingly, a federal district court will apply its own rules of procedure, but state or foreign substantive law.  *See, e.g.*, *Abogados v. AT&T, Inc.*, 223 F.3d 932, 935 (9th Cir. 2000).

Unfortunately, "[c]lassification of a law as 'substantive' or 'procedural' for *Erie* purposes is sometimes a challenging endeavor."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  "In determining whether a state law is substantive or procedural, we ask whether the law is outcome determinative," that is, whether not applying the law would significantly affect the result of the litigation.  *Cuprite Mine Partners LLC v. Anderson*, 809 F.3d 548, 555 (9th Cir. 2015). We have explained that "[a] substantive rule is one that creates rights or obligations" while a procedural rule "defines a form and mode of enforcing the substantive right or obligation."  *County of Orange v. U.S. District Court (In re County of Orange)*, 784 F.3d 520, 527 (9th Cir. 2015) (internal quotation marks omitted).  Our inquiry is "guided by 'the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws.'"  *Cuprite Mine*, 809 F.3d at 555 (quoting *Gasperini*, 518 U.S. at 428).  It is important to the fair administration of law that "'the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court.'"  *Gasperini*, 518 U.S. at 427 (quoting *Guar. Tr.*, 326 U.S. at 109).  The same logic applies when a foreign, rather than state, forum is at issue.

The plaintiffs argue that the district court should not have conducted a choice-of-law analysis at all because the channeling provision in the Compensation Act is procedural and not substantive.  According to the plaintiffs, the provision

effectively "strips a court of jurisdiction" over claims against anyone other than an operator of a nuclear plant. But the plaintiffs do not explain how that is the case. While it is a well-established principle that jurisdictional rules are not substantive, *see McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 224 (1957), the plaintiffs make no meaningful argument about how the channeling provision is jurisdictional. The channeling provision makes no reference to jurisdiction or, indeed, to any court.[4] It simply provides that only the operator of a nuclear reactor will be liable for any damages caused by the operation of the facility. That is not a jurisdictional provision. *See Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 160–61 (2010).

The channeling provision is much more akin to state statutes that limit liability for certain injuries. If "[j]urisdiction is the power to declare law," *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869), the channeling provision is the law itself, not an assignment of the power to declare it. Importantly, California courts have routinely treated such liability-limiting provisions as substantive law and applied them under California's choice-of-law rules. *See, e.g.*, *Offshore Rental Co. v. Cont'l Oil Co.*, 583 P.2d 721, 729 (Cal. 1978) (applying Louisiana law foreclosing employer's cause of action for negligent injury to key employee); *Castro v. Budget Rent-A-Car Sys., Inc.*, 65 Cal. Rptr. 3d 430, 444 (Ct. App. 2007) (applying Alabama law precluding liability against vehicle owner for negligence of a permissive user).

---

[4] Under Japanese procedures put in place after the disaster, claims may be filed, but do not have to be filed, in a Japanese court. They may also be filed with TEPCO directly or with the Nuclear Damage Claim Dispute Resolution Center, created after the FNPP incident.

Moreover, application of the channeling provision ends the case as to GE's liability, making the provision, as the plaintiffs concede, outcome-determinative. This weighs heavily in favor of finding that the provision is substantive rather than procedural. *See Gasperini*, 518 U.S. at 427–28. A liability-limiting statute with such outcome-determinative implications is substantive and subject to a choice-of-law analysis.

###### 2. Propriety of Choice-of-Law Analysis at the Motion-to-Dismiss Stage

The plaintiffs next contend that the district court erred by conducting a choice-of-law analysis at this stage of the litigation. They argue that they needed additional time and discovery to fully develop the arguments and factual issues related to the choice-of-law analysis. The district court rejected this argument, finding that it was appropriate to analyze choice-of-law at this stage because the issue was fully briefed and discovery would not affect the analysis.

The plaintiffs argue that a choice-of-law determination "requires a level of factual development and detailed legal briefing that was not and is not present in" this case at this time. But the plaintiffs cite no principle to support the argument that a court cannot decide choice-of-law issues in a motion to dismiss. And although some district courts reserve ruling on the issue until later in the litigation, the district court here had all the argument and facts necessary to make its decision.

As to the contention that additional legal briefing was necessary, choice of law was one of the primary issues presented to the district court in the motion to dismiss. It was

fully briefed by both parties, and the district court was able to engage in a complete analysis. This is unlike some of the cases the plaintiffs cited, in which the parties had provided little or no briefing when asking the district court to decide the choice-of-law question. *See, e.g.*, *Dean v. Colgate-Palmolive Co.*, 2015 WL 3999313, at \*11 (C.D. Cal. June 17, 2015) (no analysis at all); *Czuchaj v. Conair Corp.*, 2014 WL 1664235, at \*9 (S.D. Cal. Apr. 18, 2014) (one page); *Brazil v. Dole Food Co.*, 2013 WL 5312418, at \*11 (N.D. Cal. Sept. 23, 2013) (no analysis at all).

We are also not persuaded that the district court needed a more expansive factual record to decide the choice-of-law issue. The plaintiffs first argue that the terms of the contract between GE and TEPCO, particularly its choice-of-law or venue provisions, could influence the analysis. But those provisions have no bearing on tort claims filed by third parties, like the plaintiffs. *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992) ("Claims arising in tort are not ordinarily controlled by a contractual choice of law provision."); *see also Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1165 (9th Cir. 1996) (finding third parties cannot be bound by a choice-of-law provision in a contract in which they had no interest). The plaintiffs also contend that discovery could shed light on information about the operational responsibilities of GE and TEPCO, as well as TEPCO's knowledge about the incoming U.S. naval ships. But the plaintiffs offer no explanation about why this information would be important to the analysis of whether California or Japan has a greater interest in the application of its substantive laws to the claims against GE. That information could be important to determining GE's ultimate liability, but it has no bearing on the choice-of-law analysis.

The district court did not err in proceeding with the full choice-of-law analysis.

### 3. Choice of Law

The final question is whether the district court erred when it decided that the laws of Japan, not California, govern plaintiffs' claims against GE. California courts decide choice-of-law questions by means of the "governmental interest" test, which proceeds in three steps. *Offshore Rental*, 583 P.2d at 723. First, the court must determine whether the substantive laws of California and the foreign jurisdiction differ on the issue before it. *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1422 (9th Cir. 1989). Second, if the laws do differ, then the court must determine what interest, if any, the competing jurisdictions have in the application of their respective laws. *Id.* "If only one jurisdiction has a legitimate interest in the application of its rule of decision, there is a 'false conflict' and the law of the interested jurisdiction is applied." *Id.* But if more than one jurisdiction has a legitimate interest, "the court must move to the third stage of the analysis, which focuses on the 'comparative impairment' of the interested jurisdictions." *Id.* This third step requires the court to "identify and apply 'the law of the state whose interest would be the more impaired if its law were not applied.'" *Id.* (quoting *Offshore Rental*, 583 P.2d at 726).

#### a. The Laws Differ

The parties agree that the laws of California and Japan differ. Under Japanese law, the Compensation Act would apply and channel liability for nuclear damage exclusively to the licensed operator of the nuclear installation—here, TEPCO. If Japanese law applies, it requires dismissal of all

claims against GE.  Under California law, on the other hand, a manufacturer such as GE is strictly liable if its product is defectively manufactured, defectively designed, or distributed without adequate instructions or warnings.  *See Hufft v. Horowitz*, 5 Cal. Rptr. 2d 377, 379 (Ct. App. 1992).  If California law applies and the plaintiffs prove that GE defectively manufactured or designed the reactor, GE would be strictly liable.  *See id.*

### b.   Both Jurisdictions Have a Legitimate Interest

We must next determine what interest, if any, Japan and California have in the application of their respective laws to this case. *Offshore Rental*, 583 P.2d at 724–25.  Only if each jurisdiction involved has a legitimate but conflicting interest in applying its own law will there be a "true conflict," requiring us to move on to step three of the analysis. *Id.* at 725–26.  The plaintiffs agree that there is a true conflict, but contend that Japan's interests are not "strong."  GE argues that there is no true conflict because, while Japan has substantial, legitimate interests in applying its laws, California's interests are "minimal at best."  It asserts that the plaintiffs' claims directly implicate conduct that occurred in Japan and is subject to a Japanese liability-limiting statute, giving Japan strong legitimate interests in having its law applied.  In contrast, GE contends that California's only interest is in ensuring compensation for California-resident victims, which would be equally served under Japanese law.

At this point in the analysis, our only consideration is whether each jurisdiction has legitimate interests in seeing its own law applied in this case and whether those interests conflict.  Weighing the strength of California's interests

against Japan's occurs at the third step, which we need only reach if there is a true conflict.

(1) *Japan's Interests*. The parties generally agree that Japan has legitimate interests in having its law applied to this case. These interests are: (1) adjudicating claims arising from a natural disaster that occurred in Japan, (2) adjudicating claims arising from injuries that occurred in Japan, and (3) providing consistent allocation of liability for nuclear disasters under the Compensation Act. The final interest is of particular importance. As the California Supreme Court has stated:

> When a state adopts a rule of law limiting liability for commercial activity conducted within the state in order to provide what the state perceives is fair treatment to, and an appropriate incentive for, business enterprises, we believe that the state ordinarily has an interest in having that policy of limited liability applied to out-of-state companies that conduct business in the state, as well as to businesses incorporated or headquartered within the state.

*McCann v. Foster Wheeler LLC*, 225 P.3d 516, 530 (Cal. 2010). Here, Japan's Compensation Act limits liability for participants in its nuclear industry, in part as an incentive for businesses to participate. This is a "real and legitimate interest" in having Japanese law apply to the case. *Id.* at 531–32.

(2) *California's Interest.* California law holds manufacturers strictly liable for products defectively

manufactured or designed. *Hufft*, 5 Cal. Rptr. 2d at 379. California courts have described the state's interest underlying this law:

> [It] is to [e]nsure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves. The other purposes, or public policies, behind the creation of the doctrine of strict products liability in tort as a theory of recovery are: (1) to provide a short cut to liability where negligence may be present but difficult to prove; (2) to provide an economic incentive for improved product safety; (3) to induce allocation of resources towards safer products; and (4) to spread the risk of loss among all who use the product.

*Barrett v. Superior Court*, 272 Cal. Rptr. 304, 309 (Ct. App. 1990) (internal quotation marks and citations omitted). These interests are certainly legitimate.

GE, however, contends that these interests are insignificant in this case, arguing that the plaintiffs "cannot manufacture a true conflict by invoking irrelevant policies and interests." It argues that policies underlying California's strict-products-liability law "are immaterial here because there are no 'products' at issue." But that is not the case. While it is true that the district court previously commented that "[t]he FNPP was evidently not a product 'placed on the market,'" *Cooper II*, 166 F. Supp. 3d at 1129, the claims against GE do not arise out of the FNPP as a single entity.

GE manufactured particular parts of the Fukushima Daiichi facility—the reactors.  The fact that reactors were not marketed broadly to consumers does not detract from the fact that they were designed and built for the FNPP.  That is sufficient, in a proper case, to be subject to California's products liability rules.  *See Rawlings v. D.M. Oliver, Inc.*, 159 Cal. Rptr. 119, 122 (Ct. App. 1979) (holding that the fact that a product was not mass produced has no effect on the manufacturer's responsibilities in manufacturing and selling products).

Although there are no California defendants in this case, there are plaintiffs who are California residents.  And California has a legitimate interest in ensuring that its injured residents are compensated for injuries resulting from the design and manufacture of faulty products, as well as providing an easy way to prove liability.  So, the interests served by California's strict-products-liability laws are also relevant.

We conclude, as did the district court, that there is a so-called "true conflict" here.  California has an interest in holding manufacturers of defective products liable in tort to ensure compensation for its residents.  Japan, on the other hand, has an interest in consistent application of its liability-limiting statute to businesses participating in its nuclear industry.  We therefore move to the final step of the analysis.

### c.  Japan's Interests Would be More Impaired if Its Law Were Not Applied

Once a true conflict is identified, we must consider the "comparative impairment" step of the analysis, which "seeks to determine which state's interest would be more impaired

if its policy were subordinated to the policy of the other state." *Offshore Rental*, 583 P.2d at 726. The conflict "should be resolved by applying the law of the state whose interest would be the more impaired if its law were not applied." *Id.* The purpose of this step is not for us to judge which law is "better" or "worthier" social policy; instead, we are "to decide—in light of the legal question at issue and the relevant state interests at stake—which jurisdiction should be allocated the predominating lawmaking power under the circumstances of the present case." *McCann*, 225 P.3d at 534.

California's courts have frequently applied foreign laws that serve to protect businesses by limiting liability, even when applying that law precludes recovery by injured California residents. For example, in *Offshore Rental*, a California corporation brought a claim against a Louisiana company for the loss of services of a "key" employee who was injured on the defendant company's premises in Louisiana. 583 P.2d at 729. The California Supreme Court noted that Louisiana's interest in applying its own law to the case was "to protect negligent resident tort-feasors acting within Louisiana's borders from the financial hardships caused by the assessment of excessive legal liability or exaggerated claims resulting from the loss of services of a key employee." *Id.* at 725. California had made a different choice in legal policies: California had "an interest in protecting California employers from economic harm because of negligent injury to a key employee inflicted by a third party." *Id.* Weighing these competing interests, the court held that "[a]t the heart" of Louisiana's liability-limiting law was "the vital interest in promoting freedom of investment and enterprise *within Louisiana's borders*, among investors incorporated both in Louisiana and elsewhere." *Id.* at 728.

Imposing liability in this situation, when Louisiana had decided not to, would therefore "strike at the essence of a compelling Louisiana law." *Id.* Particularly because the accident occurred in Louisiana, California's interest in compensation for injured California companies could not overcome Louisiana's greater interest in protecting businesses operating there. *Id.* at 728–29. Applying Louisiana law and finding no cause of action, the court affirmed dismissal of the suit.

Similarly, in *McCann*, the California Supreme Court applied Oklahoma law that limited a defendant's liability even though it precluded recovery for a California plaintiff. 225 P.3d at 537. McCann was exposed to asbestos while working in an oil refinery in Oklahoma in the 1950s. Many years later he developed mesothelioma, and brought suit in his home state, California, against the manufacturer of a boiler installed in the refinery. The manufacturer was a resident of neither Oklahoma nor California, but of New York. Relying on *Offshore Rental*, the court applied Oklahoma's 10-year statute of repose to the plaintiff's claim instead of California's statute of limitations.[5] *Id.* The court noted that Oklahoma had an interest in promoting commercial activity within the state by limiting businesses' liability, while California had a general interest in ensuring compensation for its injured residents, and had a special interest in providing relief from "asbestos-related harm." *Id.* at 532. Nevertheless, the court concluded that applying

---

[5] Under Oklahoma's statute of repose, the time for filing suit ran from the time the construction project was completed, whether McCann knew of his injury or not. Under California's statute of limitations, McCann had one year from the time he learned of his mesothelioma. *McCann*, 225 P.2d at 521 & n.2, 523, 529.

California's statute of limitations would "significantly undermine Oklahoma's interest in establishing a reliable rule of law governing a business's potential liability for conduct undertaken in Oklahoma." *Id.* at 535. In contrast, failure to apply California law would have had a less significant impact on California's interest. *Id.* While it precluded the plaintiff's recovery, California courts take a "restrained view" of California's interest in recovery for its residents for injuries that occur in another jurisdiction. *Id.* at 535–36 (discussing *Offshore Rental*, 583 P.2d at 728, and *Castro*, 65 Cal. Rptr. 3d at 443–44). Given Oklahoma's strong interest in limiting liability for commercial activity within its borders, the California Supreme Court applied Oklahoma law and dismissed the McCann's claim. *Id.* at 537.

In light of this precedent, the district court correctly decided that Japanese law should apply to this case. Japan's interests here are similar to those at issue in *Offshore Rental*, *McCann*, and other cases in which California courts (and federal courts applying California's choice-of-law rules) have found that California's interest in compensation for injured residents failed to overcome a foreign jurisdiction's interest in limiting defendants' substantive liability for injuries occurring within its borders.[6] Japan's interest here is in

---

[6] *See Arno v. Club Med Inc.*, 22 F.3d 1464, 1469 (9th Cir. 1994) (applying French law to plaintiff's vicarious-liability claim because Guadeloupe's interest in "encouraging local industry . . . and reliably defining the duties and scope of liability of an employer doing business within its borders" would be more impaired than California's interest in "providing compensation to its residents" if its law was not applied); *Castro*, 65 Cal. Rptr. 3d at 443–44 (applying Alabama law because its interest in allocating liability would be more impaired by application of California's more permissive statute than would California's interest in compensation for injured residents if Alabama law was applied); *Tucci v.*

limiting liability for defendants engaged in the nuclear-power industry in Japan.  Japan made a conscious decision to encourage nuclear power in Japan.  It balanced "providing protection for injured parties" with "contributing to the sound development of nuclear reactor operations."  Compensation Act, ch. I, art. 1.  Under the Compensation Act, "the Nuclear Operator is liable to compensate for damages in connection with the Operation . . . of [the] Nuclear Reactor" and "no other persons shall be liable to compensate for damages other than the Nuclear Operator."  *Id*. at ch. II, arts. 3–4.  In comparing Japan's and California's interests, we cannot judge which policy embodies "the better or worthier rule," but instead must determine which jurisdiction's interest would be most "significantly impair[ed]" if its law were not applied. *McCann*, 225 P.3d at 534.

We have little difficulty concluding that failure to apply Japanese law in these circumstances would significantly impair Japan's interests.  Japan's Compensation Act is directed specifically at accidents at a nuclear facility; California's products liability rules are general in nature and presumably cover everything from toasters to airplanes.  The release of radiation occurred at the FNPP on Japanese soil and the United States sent the *U.S.S. Ronald Reagan* to Japan in aid of the disaster.[7]

*Club Mediterranee, S.A.*, 107 Cal. Rptr. 2d 401, 408–12 (Ct. App. 2001) (applying Dominican law in light of the Dominican Republic's superior interest in "assuring that businesses . . . face limited and predictable financial liability for work-related injuries").

[7] Before the district court and in their opening brief, the plaintiffs argued that the injury here did not occur in Japan because it happened in international waters.  In reply and at oral argument, the plaintiffs amended that argument and now claim that the injury occurred on "U.S. soil"

Even if application of the Compensation Act would bar any relief for these plaintiffs, we would still be required to apply Japanese law. *See McCann*, 225 P.3d at 537–38; *Offshore Rental*, 583 P.2d at 729. But application of Japanese law does not entirely foreclose recovery for the plaintiffs here. Japanese law allows for compensation for the plaintiffs' injuries—just not from GE. This makes application of Japanese law less intrusive on California's interests than in cases like *McCann* and *Offshore Rental*. For these reasons, Japanese law applies to the claims against GE. Because there is no dispute on appeal that application of Japanese law requires dismissal of all claims against GE, we affirm the dismissal of these claims with prejudice.[8]

## B. *TEPCO*

We next address TEPCO's motion to dismiss. The district court also engaged in a choice-of-law analysis for the claims against TEPCO. After determining that Japanese law should apply, the court dismissed the claims against TEPCO on international-comity grounds. We begin by addressing the choice-of-law analysis. We then consider international comity.

### 1. Choice of Law

The plaintiffs raise the same challenges to this choice-of-law analysis as they did to the analysis of the claims against

---

because the sailors were injured on U.S. ships. This argument, presented for the first time in the reply, has forfeited. *See Rizk v. Holder*, 629 F.3d 1083, 1091 n.3 (9th Cir. 2011).

[8] We therefore need not reach the alternative arguments in GE's brief.

GE. For the reasons previously stated, the choice-of-law analysis is not premature or inappropriate at this stage. As to the merits of the choice-of-law analysis, the district court correctly found that Japanese law also applies to the plaintiffs' claims against TEPCO.

### a. The Laws Differ

There is no disagreement that the laws of Japan and California differ in three ways with regard to the claims against TEPCO. First, under Japanese law, the Compensation Act is the exclusive means of redress, Saikō Saibansho [Sup. Ct.] May 14, 2009, 2066 HANREI JIHŌ [HANJI] 54,[9] but under California law, there is no such exclusive remedy. Second, the Compensation Act requires a "high probability" of causation, Saikō Saibansho [Sup. Ct.] Oct. 24, 1975, 29 Saikō Saibansho Minji Hanreishū [Minshū] 1417, 1419–20, while California negligence principles require the plaintiffs to show only that their injuries were "more likely than not" caused by radiation exposure. *Jones v. Ortho Pharm. Corp.*, 209 Cal. Rptr. 456, 460 (Ct. App. 1985). Finally, Japanese law has a broad definition of compensatory damages, including damages for proprietary and material losses, spiritual or mental suffering ("consolation money"), and income lost over a lifetime, but it does not recognize or allow for punitive damages, Saikō Saibansho [Sup. Ct.] July 11, 1997, 51(6)

---

[9] The cases cited here were explained in a detailed declaration from Yasuhei Taniguchi, a retired professor of law who has taught at several Japanese universities. In addition to an LL.B. from Kyoto University, Professor Taniguchi holds an LL.M. from the University of California at Berkeley and a J.S.D. from Cornell University. His analysis was credited by the district court and is not disputed by the plaintiffs.

Saikō Saibansho Minji Hanreishū [Minshū] 2573, while
California law does. Cal. Civ. Code § 3294.

### b. Both Jurisdictions Have Legitimate Interests

The plaintiffs made no argument here or before the
district court regarding the interests of either forum. We
conclude that the same interests are implicated here as in the
analysis of the claims against GE. California has an interest
in ensuring compensation for its injured residents, while
Japan has an interest in the consistent application of the
Compensation Act to protect its nuclear industry. There is
therefore a true conflict and we proceed to step three of the
governmental-interest test.

### c. Japan's Interests Would be More Impaired if Its Law Was Not Applied

The analysis at this step is also much the same as for the
claims against GE. As noted *supra*, California courts have
frequently applied foreign laws like the Compensation
Act—which serve to limit liability for businesses—in these
situations. Japan has an even greater interest in its law
applying to the claims against TEPCO than it did with respect
to GE. TEPCO is a Japanese corporation operating a nuclear
reactor in Japan. It is not only subject to general principles of
Japanese law but, as evidenced by the Compensation Act, to
a series of special rules regarding its responsibility following
a nuclear disaster, just as American nuclear plant operators
are subject to special liability rules under the Price-Anderson
Act.[10] Furthermore, following the disaster and consistent

---

[10] *See* 42 U.S.C. § 2210. *See also Duke Power Co. v. Carolina Envtl.
Study Grp.*, 438 U.S. 59, 63–67 (1978) (background on the Act).

with the Compensation Act, the Japanese government has come forward to fund compensation for the victims of the FNPP meltdown. We were advised in TEPCO's brief and at oral argument that the Japanese government has allocated, to date, more than $76 billion to compensate victims, and that more than 21,000 victims have received some form of compensation. Japan has a strong interest in the uniform application of the Compensation Act. Subjecting TEPCO to California's negligence rules would seriously undermine the comprehensive scheme in the Compensation Act and impair Japan's interests. In contrast, California has an interest in seeing the victims of a nuclear disaster compensated, but that interest would be equally served under Japanese law.[11] The Compensation Act operates to compensate those injured by nuclear accidents and the plaintiffs offered no showing that they cannot be adequately compensated for their injuries under Japanese law.[12]

Because Japan's interests would be more impaired if California's laws were applied than California's would if Japanese law were applied, we conclude that Japanese law applies to the claims against TEPCO and affirm the district court's holding on the choice-of-law issue. We now proceed to the question of whether, given that Japanese law must be applied in any proceedings in the Southern District of

---

[11] Of course, as discussed, the plaintiffs would not be able to recover punitive damages under Japanese law. But punitive damages are not intended to compensate for a plaintiff's losses, *see State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003), and TEPCO has stated that injured parties will be fully compensated for proven injuries.

[12] At oral argument, TEPCO agreed to waive any statute of limitations defense provided the plaintiffs filed their claims in Japan within a reasonable amount of time.

California, the district court abused its discretion in dismissing the case on international-comity grounds.

### 2.  International Comity

"International comity 'is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.'" *Mujica v. AirScan Inc.*, 771 F.3d 580, 597 (9th Cir. 2014) (quoting *In re Simon*, 153 F.3d 991, 998 (9th Cir. 1998)) (other citations omitted).  It is "a doctrine of prudential abstention, one that 'counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of international law.'" *Id.* at 598 (quoting *United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 8 (1st Cir. 1997)). International comity embodies the policy of "good neighbourliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards." *Id.*

There are two kinds of international comity: prescriptive comity (addressing "the extraterritorial reach of federal statutes") and adjudicative comity (a "discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state"). *Id.* at 598–99.  This case deals only with adjudicative comity.

In deciding whether to apply the doctrine of adjudicative comity, the courts weigh "several factors, including [1] the strength of the United States' interest in using a foreign

forum, [2] the strength of the foreign governments' interests, and [3] the adequacy of the alternative forum." *Id.* at 603 (quoting *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004)) (brackets in original)). In *Mujica*, we expounded on how to assess the United States' and the foreign government's interests in relying on a foreign forum:

> The (nonexclusive) factors we should consider when assessing [each country's] interests include (1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) the foreign policy interests of the [countries], and (5) any public policy interests.

*Id.* at 604; *see also id.* at 607. These considerations need not be addressed mechanically.

We review the district court's international-comity determination for an abuse of discretion and reverse only if the district court applied an incorrect legal standard or if its "application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in the inferences that may be drawn from the facts in the record.'" *Id.* at 589 (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). The district court here "correctly laid out [the] legal standard," so "the only question is whether the district court's decision . . . to dismiss Plaintiffs' claims was illogical, implausible, or unsupported by the record." *Cooper III*, 860 F.3d at 1205.

In our previous opinion, we concluded that the district court did not abuse its discretion when it decided against dismissing the claims against TEPCO on comity grounds. *Id.* at 1209. We recognized that this was a "difficult case" and that there were "strong reasons for dismissing the plaintiffs' claims in favor of a Japanese forum." *Id.* We noted that "further developments in the district court may counsel in favor" of dismissal, particularly once the district court determined which jurisdiction's law would apply. *Id.* at 1210 n.12. On remand, the district court reconsidered its comity analysis based on new developments, finding that these developments tilted the scales towards dismissal. The location of the conduct in question, nationality of the parties, nature of the conduct, and the public-policy interests remained the same. But after considering the statements from the Japanese and United States governments—which the district court did not have before it when it first ruled on the issue—the district court found that the foreign-policy interests now favored dismissal.[13] And because the choice-of-law analysis is relevant to comity decisions, the district court found that its conclusion that Japanese law applied also

---

[13] The district court also left its previous decision on the adequacy-of-the-alternative-forum factor undisturbed, and the plaintiffs do not challenge this factor on appeal. They make passing reference to "the disparities between the American justice system and Japan's," but do so without citation to the record or law that supports the implication that Japan would be an inadequate forum. They claim that the defendants needed to present "clear and incontrovertible evidence" that Japan's courts would not "deprive Plaintiffs of due process and equal protection of law to which they are entitled," but our precedent imposes no such requirement. The plaintiffs raised similar unsubstantiated claims of bias in their previous appeal, but we found that there was "no doubt that Japan would provide an adequate alternative forum." *Cooper III*, 860 F.3d at 1209. The district court did not abuse its discretion by leaving its previous analysis of this factor in place.

weighed in favor of dismissal on comity grounds. The plaintiffs contend that this was an abuse of discretion because "nothing has changed except for the court's willingness to revisit the issue of international comity and decide to punt this case to Japan."

First, the conclusion that Japanese law applies to the case does affect the comity analysis. *See Cooper III*, 860 F.3d at 1210 n.12 (citing *Mujica*, 771 F.3d at 602; *Ungaro-Benages*, 379 F.3d at 1240). It was not an abuse of discretion for the district court to take the applicability of Japanese law into consideration. If Japan's interest in the applicability of its laws to this case was strong enough to overcome California's interests in the choice-of-law analysis, it was not illogical or implausible for the district court to find that Japan had a similarly strong interest in being the place where the plaintiffs' claims are litigated. We can take notice of the fact that if the suit proceeds in the Southern District of California, the district court will have to inform itself at every turn of the nuances of Japanese civil law. That would require understanding who bears the burden of proof, principles of causation, and what constitute compensable damages. Not only would the district court have to educate itself on the law, but it would need to understand how the Compensation Act has been administered in the thousands of cases resolved in Japan, lest the "change of courtrooms" mean a change in result. *Van Dusen*, 376 U.S. at 639.

The other "significant change" that the district court found affected its analysis was the amicus briefs filed in our court during the first appeal. Neither government had expressed its views on litigating in U.S. courts before *Cooper III*. After Japan filed an amicus brief in *Cooper III* expressing a strong interest in the case being litigated in

Japan, we invited the United States Department of State to give its views on whether the litigation should proceed in the United States.[14]  We considered both amicus briefs and found that they expressed "important, competing policy interests" that required "difficult judgment calls" from the district court. *Cooper III*, 860 F.3d at 1209.  On remand, the district court weighed the interests expressed in the governments' amicus briefs and decided that, in light of the Japanese government's strong objection to the case being litigated in the United States, the foreign-policy factor now weighed in favor of dismissal.

This was a significant change from the first time the district court engaged in the comity analysis, despite the plaintiffs' assertions to the contrary.  The first time the district court considered the comity factors, neither Japan nor the United States had expressed an opinion to the district court about the appropriate venue for the litigation.  It was not improper for the district court to reconsider its previous holding in light of those statements.

---

[14] In *Cooper III*, TEPCO and GE (appearing as amicus) argued that dismissal on comity grounds would promote the Convention on Supplementary Compensation for Nuclear Damage ("CSC").  The United States argued that, in denying dismissal on comity grounds, the district court did not abuse its discretion. *See Cooper III*, 860 F.3d at 1199–1200. The CSC guarantees that its contracting parties will have exclusive jurisdiction over litigation arising out of a nuclear incident within their borders.  Because Japan was not a contracting party to the CSC at the time of the FNPP disaster, the United States objected to the courts relying on this argument from TEPCO and GE.  Otherwise, the United States argued that it had "no specific foreign policy interest necessitating dismissal in this particular case." *Id.* at 1208.

The plaintiffs suggest that the district court effectively "overruled the Ninth Circuit," by weighing the amicus briefs and coming to a different conclusion. But the district court did nothing of the kind. In *Cooper III*, we fairly invited the district court to revisit the comity analysis if and when circumstances changed. *Id.* at 1210 & n.12. And the statement from both governments about where the litigation should proceed was a changed circumstance for the district court. The argument that the statements were not new because we had them before us in *Cooper III* misunderstands the scope of our review in that case. The question before us then was not whether we, with the benefit of the statements, would have dismissed the suit on comity grounds, but whether the district court had abused its discretion with the information that it had. We were careful in stating our standard of review in that case. *Cooper III*, 860 F.3d at 1205, 1209. Once the district court had the positions of the United States and Japanese governments before it, it was entirely proper for the district court to revisit the comity analysis.

In its amicus brief, Japan strongly objected to this case being litigated in the United States. Japan has committed a significant sum of money and resources to ensure fair and consistent compensation for accident victims. Japan pointed out that if injured parties could bring their claims anywhere in the world, foreign courts might apply different legal standards, resulting in different outcomes for similarly situated victims. *See id.* at 1207. This would seriously affect the integrity of the compensation system established by the Japanese government. And because the Japanese government is financing TEPCO's compensation payments, which are administered through Japanese courts, that risk is particularly troublesome. *See id*. at 1209 ("Japan has an undeniably strong interest in centralizing jurisdiction over FNPP-related

claims."). If Japan cannot exercise some control over the compensation process, it may be less willing to compensate FNPP victims who seek remedies outside of a Japanese forum. That may complicate the victims' ability to be compensated. *See Cooper III*, 860 F.3d at 1207 ("Judgments originating in American courts may well be inconsistent with the overall administration of Japan's compensation fund.")

When the district court revisited the comity factors, it noted TEPCO's argument that Japan's interests "have only grown stronger" since its brief was filed. With the benefit of this position, the district court found that the foreign policy factor weighed in favor of dismissal, despite the United States' "important, competing policy interest."

The plaintiffs contend that it was illogical for the district court not to consider the United States' amicus brief in its analysis and that the district court owed deference to the State Department's opinion about whether to exercise jurisdiction. But the district court acknowledged the United States' statement and its competing foreign-policy concerns in its order. And to the extent that the plaintiffs contend that the State Department's brief is an affirmative statement from the government that was entitled to special deference, the plaintiffs overstate their case. The plaintiffs point to no principle that requires district courts to defer to statements of interest from the United States. We will give "serious weight to" such statements, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004), but "[a] statement of national interest alone . . . does not take the present litigation outside the competence of the judiciary," *Ungaro-Benages*, 379 F.3d at 1236.

Moreover, the United States issued a careful, cautious statement. The United States first "applaud[ed] the

Government of Japan's impressive efforts to provide recovery for damages caused by the nuclear accident at the Fukushima-Daiichi power plant, including through the creation of an administrative compensation scheme that has paid over $58 billion in claims." It did express an interest in Japan not retroactively receiving exclusive jurisdiction over suits under the CSC, which Japan had not signed at the time of the FNPP incident. And, *for that reason*, the U.S. urged us not to overturn the district court's decision in *Cooper III*. *See Cooper III*, 860 F.3d at 1207–09. But outside of that, the United States said only that although "a district court could choose to dismiss a case based on international comity for a claim arising overseas[,] . . . [t]he United States has no specific firm policy interest necessitating dismissal in this particular case." The United States stopped well short of urging that California was the proper forum to exercise jurisdiction in this case. The United States thus voiced its concerns with the *reasons* for which the district court would grant dismissal on comity grounds, but expressed no objection that Japan be permitted to adjudicate these claims in its own courts.

The United States' measured response pales in comparison to Japan's unequivocal objection to the exercise of jurisdiction in U.S. courts. Recognizing Japan's interests under these circumstances was not illogical or implausible, particularly once the district court determined that Japanese law would apply to the claims.

We acknowledge that the case is complicated. It implicates strong, important policy interests in both countries. But comity is a "fluid doctrine" that can "change in the course of the litigation." *Cooper III*, 860 F.3d at 1210. We invited the district court to reevaluate its decision in

appropriate circumstances. The district court did so, and carefully explained its reasons. Having decided that Japanese law applies to the case and considering Japan's strong interests in the case being litigated in Japan, the district court did not abuse its discretion when it dismissed the claims against TEPCO on international-comity grounds.[15]

## III. CONCLUSION

We affirm the district court's granting of both GE's and TEPCO's motions to dismiss.

**AFFIRMED.**

---

[15] In light our disposition, we do not reach TEPCO's personal-jurisdiction argument.